**In re Kathleen M. BELDEN, Debtor.**

**Bankruptcy No. 4–92–1615.**

United States Bankruptcy Court, D. Minnesota.

Sept. 16, 1992.

Katherine A. Constantine and Heather Brown Thayer, Dorsey & Whitney, Minneapolis, Minn., for Northern States Power Co.

Jeffrey S. Ronbeck, Minneapolis, Minn., for debtor.

## ORDER DENYING CONFIRMATION AND DISMISSING CASE

ROBERT J. KRESSEL, Chief Judge.

This case came on for hearing on confirmation of the debtor's chapter 13 plan and Northern States Power Company's motion to dismiss her case. Jeffrey S. Ronbeck appeared on behalf of the debtor and Katherine A. Constantine and Heather Brown Thayer appeared on behalf of NSP. This court has jurisdiction pursuant to 28 U.S.C.

§§ 157 and 1334 and Local Rule 201. These are core proceeding under § 157(b)(2)(A) and (L). Based on the memoranda, arguments of counsel and the file in this case, I make the following memorandum order.

## FACTUAL BACKGROUND

The debtor filed her present chapter 13 case on March 2, 1992. She filed her schedules, lists, other required forms and her plan on March 17, 1992. NSP objected to confirmation of the debtor's plan.

NSP also moved to dismiss the debtor's case and to prohibit the debtor from filing another bankruptcy case for five years. NSP also requested the court to sanction the debtor's attorney under Fed.R.Bankr.P. 9011(a) for signing the debtor's petition. The trustee and the United States Trustee support NSP's motion.

The debtor has a long history of bankruptcy cases. In fact, the debtor may fairly be called a bankruptcy addict, using bankruptcy, not as prescribed to obtain a fresh start, but rather abuses it to obtain temporary escape from the reality of her financial problems.

## 1978 STRAIGHT BANKRUPTCY CASE

The debtor's financial difficulties began as early as 1978. On July 18, 1978, the she filed a straight bankruptcy case under the Bankruptcy Act, the equivalent of a modern chapter 7 case. The debtor's[1] statement of affairs indicates that she earned $3,545.00 in 1976 but that she earned no income in 1977. It appears the debtor's only child was born in 1977 and that she was divorced that year. There is no indication that the debtor received child support.

At the time the debtor filed her straight bankruptcy, three creditors had already obtained judgments against her. The debtor's schedules reveal that she had no priority creditors but that she had one secured debt of $496.00 secured by a color T.V.

The debtor's unsecured debts totalled $5,104.48. The unsecured debts consisted of $1,543.00 for clothes, $2,099.94 for a car and consumer goods, $188.00 for medical expenses, $176.54 for work related expenses, $941.00 for unpaid rent and $156.00 for legal expenses. The debtor claimed $3,005.00 in exempt property under Minn. Stat. § 550.37. The exempt property consisted of $2,000.00 in household goods and furnishings, $1,000.00 in wearing apparel and $5.00 in cash.

After the first meeting of creditors, the court ordered the debtor to turn over to the trustee copies of her state and federal income tax returns for 1978 and the estate's share of any refunds. The debtor's discharge was entered October 11, 1978. In the fall of 1979, the trustee filed a complaint seeking an order requiring the debtor to turn over her 1978 tax returns and 54% of her 1978 refunds. On November 13, 1979, the court again ordered the debtor to turn over the appropriate tax returns and refunds to the trustee. The debtor again failed to turn over her tax returns and refunds. In the spring of 1980, the trustee filed a complaint seeking to have the debtor's discharge waived or vacated. On June 27, 1980, the court entered an order deeming the discharge waived and revoked and vacated the debtor's discharge with a provision to stay the effectiveness of the order for 30 days to allow the debtor to turn over the property. The debtor did not turn over the tax returns or refunds. The discharge was deemed waived and revoked and vacated effective July 27, 1980. Later that summer, the trustee abandoned the estate's share of the refunds and filed a no asset report.[2] The case was closed on August 27, 1980.

### 1982 CHAPTER 7 CASE

The debtor filed her second case, a chapter 7 case, on February 26, 1982. The debtor's statement of financial affairs reflected that she earned $10,829.00 in 1980 and $10,987.00 in 1981. There is no indica-

---

**1.** The proper nomenclature under the Act was "bankrupt." However, for consistency I will refer to her as the debtor throughout.

**2.** This is something of a misnomer. Obviously there were assets in the case, but after exemption and abandonment, there were no assets to be distributed to creditors.

tion that the debtor received any child support. Her schedules indicated that the debtor had no unsecured priority creditors and she had one debt of $1,951.84 secured by a 1976 Chevy Impala.

The debtor's unsecured debts totalled $12,844.47. The unsecured debts consisted of $2,623.00 for clothes, $4,871.50 for a car and consumer goods, $991.51 for medical expenses, $102.44 for work related expenses, $941.00 for unpaid rent, $2,156.00 for legal expenses, $1,085.02 for bank services and $74.00 for utility services. The debtor claimed $2,443.16 in exempt property under 11 U.S.C. § 522. The exempt property consisted of $2,000.00 in household goods and furnishings, $243.16 equity in her car and $400.00 of funds on deposit.

The trustee filed a report of no asset case. F & M Marquette National Bank filed a dischargeability complaint against the debtor. The bank and the debtor settled the proceeding and the court ordered that the debtor's debt to the bank in the amount of $2,630.84 plus costs and interest were non-dischargeable. The debtor's discharge was entered on June 25, 1982. The case was closed on August 27, 1982.[3]

### 1983 CHAPTER 13 CASE

On November 10, 1983, the debtor filed her first chapter 13 case.[4] The debtor's chapter 13 statement reflected that she earned $15,600.00 in 1982 and that she expected to earn $16,800.00 in 1983. The statement reveals that child support payments of $200.00 per month, which were ordered in March of 1978, had not been paid since August of 1982. The schedules reflected no unsecured priority creditors and only one secured debt secured by the Chevy Impala in the amount of $1,300.00.

The debtor listed $11,849.20 in unsecured debts. They consisted of $1,096.34 for clothes, $4,368.22 for consumer goods, $1,551.98 for medical expenses, $326.00 for unpaid rent, $3,867.76 for unsecured personal loans, $175.00 for legal expenses and $463.90 for utility services including

$185.64 owed to NSP. The debtor claimed $1,665.00 in exempt property under 11 U.S.C. § 522. The exempt property consisted of $1,300.00 in household good, furnishings and wearing apparel, $300.00 for her car and $65.00 for cash and an IRA account.

The debtor's chapter 13 statement also indicated her monthly income was $1,117.00 and her monthly expenses were $1,025.00 leaving a disposable income of $92.00 each month. The debtor's plan provided that she would pay the trustee $95.00 per month for five years which would provide $5,700.00 to pay her unsecured creditors approximately 39% of their claims.

The debtor's chapter 13 plan was confirmed on January 19, 1984. On October 23, 1984, the chapter 13 trustee moved to dismiss the debtor's case for material default in complying with the plan. At this point, the debtor's last payment had been made in April of 1984. The debtor's payments to the trustee totalled $380.00, leaving a delinquency of $570.00. The debtor made a payment and the trustee withdrew his motion.

On March 29, 1985, the chapter 13 trustee again moved to dismiss the debtor's case for a material default in complying with the plan. The debtor's last payment, $96.00, had been made on December 19, 1984, just prior to the hearing on the trustee's previous motion to dismiss. The delinquency in March of 1985 amounted to $1,044.00. An order dismissing the case was entered on April 18, 1985, but the order provided for a 30 day stay of the effect of the order. On May 2, 1985, the debtor requested that her case be voluntarily dismissed. An order dismissing the case on the debtor's request was entered May 7, 1985. The case was closed on September 19, 1985.

### 1985 CHAPTER 13 CASE

The debtor filed her fourth bankruptcy case, her second chapter 13 case, on May

---

**3.** Pursuant to 11 U.S.C. § 523(a)(10) all debts that were or could have been listed or scheduled in the debtor's 1978 case were not discharged.

**4.** By operation of 11 U.S.C. § 727(a)(7), the debtor was not eligible for another chapter 7 discharge until six years after she filed her 1982 case.

24, 1985, 17 days after the court dismissed her previous chapter 13 case. The debtor's chapter 13 statement indicated that she earned $18,000.00 in 1984 and that she expected to earn $18,000.00 in 1985. The statement revealed that the debtor did not receive any child support. The schedules reflected that the debtor had no priority creditors, but the debtor had secured debt totalling $2,045.87. The secured debt consisted of the $1,300.00 debt secured by the Chevy Impala and a $745.87 debt secured by furniture.

The debtor listed a total of $12,562.08 of unsecured debts. The unsecured debts consisted of $1,270.91 for clothes, $6,103.86 for consumer goods, $1,720.78 for medical expenses, $108.90 for unpaid rent, $175.00 for legal expenses, $2,358.75 for unsecured loans and $823.88 for utility services including $79.77 owed to NSP. The debtor claim $1,615.00 in exempt property under 11 U.S.C. § 522. The exempt property consisted of $1,300.00 in household goods, furnishings and wearing apparel, $300.00 for her car, and $15.00 in cash.

The debtor's chapter 13 statement indicated that her monthly income was $1,098.74 and her monthly expenses were $1,039.00 leaving a disposable income of $59.00 each month. The debtor's plan provided that she would pay the trustee $60.00 each month for five years which would provide $3,600.00 to pay her unsecured creditors approximately 24% of their claims.

On August 14, 1985, the trustee moved to dismiss the debtor's case for failure to make the first plan payment as required by 11 U.S.C. § 1326(a)(1). The trustee withdrew his motion when the debtor made a payment. The debtor's plan was confirmed on October 3, 1985.

On February 7, 1986, the trustee again moved to dismiss the debtor's case for material default in complying with her plan. At this point, the debtor's first and last payment had been made on August 20, 1985. The debtor's payment of $120.00 left

a delinquency of $420.00. Since the debtor resumed payments again, the trustee continued the hearing on his motion to dismiss for one month. In April 1986, the trustee withdrew his motion to dismiss the debtor's case.

The trustee filed yet another motion to dismiss the debtor's case on June 13, 1986, for failure to comply with her plan. The debtor's last payment was received on April 10, 1986, bringing the debtor's plan payments to a total of $240.00, leaving a delinquency of $540.00. Once again the debtor made payments so the trustee continued his motion to dismiss for two consecutive months. Finally, on September 4, 1986, the court granted the trustee's motion and dismissed the debtor's case. The case was closed on February 2, 1987.

### 1988 CHAPTER 7 CASE

On November 10, 1988, the debtor filed her fifth bankruptcy case, this time a chapter 7 case. The debtor's statement of financial affairs indicated that she earned $12,500.00 in 1986 and $13,075.00 in 1987. The statement indicated that the debtor received no child support.[5] The debtor's schedules reflected no priority creditors and no secured creditors.

The debtor's unsecured debts totalled $20,618.00. The unsecured debts consisted of $1,400.00 for clothes, $11,129.00 for consumer goods, $2,051.00 for medical expenses, $4,192.00 for unsecured loans, $109.00 for unpaid rent, $175.00 for legal expenses and $1,562.00 for utility services including $614.00 owed to NSP. The debtor claimed $2,255.00 in exempt property under 11 U.S.C. § 522. The exempt property consisted of $1,500.00 in household goods and furnishings, $500.00 in wearing apparel and $255.00 in cash and an IRA account.

The trustee submitted a report of no asset case. The debtor's discharge was entered February 21, 1989. The case was closed March 17, 1989.

---

5. In the debtor's response to NSP's motion to dismiss, the debtor states that she has not re-  ceived child support since 1988.

## 1989 CHAPTER 13 CASE

On June 24, 1989, four months after the debtor received her second chapter 7 discharge, the debtor filed her sixth bankruptcy case, her third chapter 13 case. The debtor's chapter 13 statement reflected that the debtor earned $24,500.00 in 1988 and that she expected to earn $24,360.00 in 1989. The statement indicated that the debtor did not receive child support. The schedules reflected no priority creditors and no secured debts.

The debtor scheduled $8,916.17 in unsecured debts. The unsecured debts consisted of $1,899.63 for consumer goods, $472.38 for medical expenses, $1090.55 for bank services, $4820.61 for unsecured loans and $633.00 for services including $358.00 owed to NSP. The debtor claimed $5,300.00 in exempt property under 11 U.S.C. § 522. The exempt property consisted of $3,000.00 in household goods and furnishings, $1,000.00 in wearing apparel, $500.00 for her car, $350.00 in cash and $450.00 in a retirement account.

The debtor's chapter 13 statement indicated her monthly income was $1,710.00 and her monthly expenses were $1,683.00 leaving a disposable income of $27.00 per month. The debtor's plan provided that she would pay the trustee $27.00 per month for five years which would provide $1,620.00 to pay her unsecured creditors approximately 19% of their claims. Prior to confirmation, the debtor modified her plan to provide that she would pay the trustee $77.00 per month for five years which would provide a total of $4,620.00 to pay her unsecured creditors approximately 23% of their claims.[6]

The debtor's modified plan was confirmed on October 5, 1989. On February 1, 1990, the trustee moved to dismiss the debtor's case for failure to comply with her plan. The first and last payment of $54.00 had been made on September 25, 1989, leaving a delinquency of $408.00. The case was dismissed on March 1, 1990. The case was closed on October 9, 1990.

6. The trustee's notes reveal that the debtor had $1634.40 in secured debts and $10,416.14 in

## 1990 CHAPTER 13 CASE

Two months after her 1989 chapter 13 case was involuntarily dismissed, the debtor filed her seventh bankruptcy case, her fourth chapter 13 case, on May 2, 1990. The debtor's chapter 13 statement indicated that the debtor earned $24,300.00 in 1989 and that she expected to earn $23,004.00 in 1990. The statement indicated that the debtor received no child support. The schedules reflected a priority claim totalling $808.00 and no secured debts.

The debtor listed $22,825.33 in unsecured debts. The unsecured debts consisted of $1,184.79 for clothes, $13,031.01 for consumer goods, $924.24 for medical expenses, $451.00 for legal expenses, $1,215.11 for bank services, $4,820.61 for unsecured loans and $1,198.57 for utility services including $799.29 owed to NSP. The debtor claimed $4,450.00 in exempt property under 11 U.S.C. § 522. The exempt property consisted of $3,000.00 in household goods and furnishings, $1,000.00 in wearing apparel, $100.00 for car and $350.00 for cash.

The debtor's chapter 13 statement indicated that the debtor's monthly income was $1,494.00 and her monthly expenses were $1,443.00 leaving a disposable income of $51.00 each month. The debtor's plan provided that she would pay the trustee $51.00 per month for five years which would provide $3,060.00 to pay her unsecured creditors less than 10% of their claims.

The debtor's plan was confirmed on August 2, 1990. On December 3, 1990, the trustee moved to dismiss the debtor's case for failure to comply with the plan. The trustee had received only one $51.00 payment on June 6, 1990, leaving a delinquency of $255.00. The case was dismissed on January 7, 1991. The case was closed May 2, 1991.

## 1991 CHAPTER 13 CASE

Less than a month after her previous chapter 13 case was dismissed, the debtor filed her eighth bankruptcy case, her fifth chapter 13 case, on February 5, 1991. The

unsecured debts.

chapter 13 statement did not reveal the debtor's income for 1990. The debtor's statement reflected that the debtor was unemployed from June 1990 to January 1991. The debtor's chapter 13 statement indicated that based on the debtor's monthly income, she expected to earn $18,000.00 in 1991. The schedules indicated that the debtor did not receive child support. The schedules also indicated that the debtor's priority debt totalled $808.00 and that she had no secured debt.

The debtor listed $28,734.38 in unsecured debts. The unsecured debts consisted of $1,804.70 for clothes, $17,073.20 for consumer goods, $1,041.77 for medical expenses, $451.00 for legal services, $1,215.11 for bank services, $4,820.61 for unsecured loans and $2,327.99 for utility services including $1,534.21 owed to NSP. The debtor claimed $4,000.00 in exempt property under 11 U.S.C. § 522. The exempt property consisted of $3,000.00 in household goods and furnishings and $1,000.00 in wearing apparel.

The debtor's chapter 13 statement indicated that her monthly income was $1,318.00 and her monthly expenses were $1,268.00 leaving a disposable income of $50.00 each month. The debtor's plan provided that she would pay the trustee $50.00 each month for five years which would provide $3,000.00 to pay her unsecured creditors approximately 7% of their claims.

The plan was confirmed on April 5, 1991. On July 9, 1991, the trustee moved to dismiss the debtor's case for failure to comply with her plan. The debtor's first and last payment of $50.00 had been made in March of 1991 leaving a delinquency of $150.00 under the plan. On August 5, 1991 the debtor's case was dismissed. This case is not yet closed.

## 1992 CHAPTER 13 CASE

The debtor filed this case, her ninth bankruptcy case and her sixth chapter 13 case, on March 2, 1992. The debtor's statement of financial affairs reflects that her income was $18,000.00 for 1990 and 1991 and that she expects to earn $18,000.00 in 1992. There is no indication that the debtor receives any child support. The schedules indicate that the debtor has held her present job at a temporary secretarial agency for three months. The debtor's schedules also reflect that her priority debts total $2,600.00 and that she has no secured debts.

The debtor's unsecured debts now amount to $47,812.35. The unsecured debts consists of $1,924.70 for clothes, $33,996.73 for a car[7] and consumer goods, $2,141.77 for medical expenses, $451.00 for legal services, $568.36 for bank services, $5,796.51 for unsecured loans, $2,933.28 for utility services including $1,900.00 owed to NSP. A significant amount of her unsecured debt is for NSF checks. The debtor claimed $4,025.00 in exempt property under 11 U.S.C. § 522. The exempt property consists of $3,000.00 in household goods and furnishings, $1,000.00 in wearing apparel and $25.00 in cash.

The debtor's schedules indicate that her current monthly income is $1,318.00 and that her monthly expenses are $1,253.00 leaving a disposable income of $65.00 each month. The debtor's plan provides that she will pay the trustee $65.00 each month. The plan does not specify how long the debtor will make payments under the plan or what percentage the unsecured creditors can expect to receive.

The following table summarizes the disposition of the debtor's nine bankruptcy cases:

| TYPE OF CASE | DATE FILED | DISPOSITION | DATE |
|---|---|---|---|
| Straight | 07/18/78 | discharge revoked | 07/27/80 |
| Ch 7 | 02/26/82 | discharge entered | 06/25/82 |

---

**7.** The debtor's schedules reflect a debt to Ford Motor Credit Company for $15,000.00. The schedules indicate that the car was repossessed. Ford filed an unsecured claim for the balance due in the amount of $6,347.32.

| TYPE OF CASE | DATE FILED | DISPOSITION | DATE |
|---|---|---|---|
| Ch 13 | 11/10/83 | voluntarily dismissed [8] | 05/07/85 |
| Ch 13 | 05/24/85 | involuntarily dismissed | 09/24/86 |
| Ch 7 | 11/10/88 | discharge entered | 02/21/89 |
| Ch 13 | 06/24/89 | involuntarily dismissed | 03/01/90 |
| Ch 13 | 05/02/90 | involuntarily dismissed | 01/07/91 |
| Ch 13 | 02/05/91 | involuntarily dismissed | 08/05/91 |
| Ch 13 | 03/02/92 | pending | |

The debtor's attorney, Jeffrey S. Ronbeck, filed the debtor's four most recent chapter 13 cases. Ronbeck has never been fully paid for the legal services he provided. Ronbeck has only been paid $148.00 in compensation for legal services rendered in all four chapter 13 cases. Other than the trustee's fee, all of the debtor's plan payments went to Ronbeck.

NSP asserts that the debtor filed this case to thwart its attempt to disconnect her utility service. NSP alleges that the debtor has established a pattern in which she fails to pay her creditors then files a chapter 13 and relies on the protection provided by the automatic stay and § 366 [9] to withstand NSP's collection actions. According to NSP, the debtor makes only nominal payments under her plans in an attempt to forestall her creditors until she can file a chapter 7 and discharge the accumulated debt every six years.

In the debtor's two previous chapter 7 cases, NSP's debts were discharged. NSP has received only 4–6 payments from the debtor since her last chapter 7 case in 1988. NSP has not received any payments under any of the debtor's previous chapter 13 plans.

In 1991, NSP requested the debtor to pay NSP a deposit for services. Although NSP never received the deposit, NSP did provide services to the debtor. NSP did not receive any payments from the debtor during her 1991 chapter 13 case. Shortly after the debtor's fifth chapter 13 case was dismissed in August of 1991, the debtor paid NSP $72.00 to forestall NSP's collection efforts. The following month, the debtor gave NSP another check but that check was returned for non-sufficient funds. Shortly after the debtor's September NSF check, the debtor moved without a forwarding address.

On October 1, 1991, the debtor used the name "Kate Velden" and a false social security number to open a new account at a new address. NSP discovered that "Kate Velden" was really Kathleen Belden in February 1992 when the debtor personally delivered a $100.00 payment on the account.[10] NSP transferred the amount due under the old account to the new account and confronted the debtor. The debtor was given the opportunity to establish that NSP made a mistake with her account but she was unable to provide any evidence that

**8.** Although the dismissal was nominally voluntary, the debtor requested dismissal in the face of the trustee's motion to dismiss.

**9.** Section 366 provides:
  (a) Except as provided in subsection (b) of this section, a utility may not alter, refuse, or discontinue service to, or discriminate against, the trustee or the debtor solely on the basis of the commencement of a case under this title or that a debt owed by the debtor to such utility for service rendered before the order for relief was not paid when due.
  (b) Such utility may alter, refuse, or discontinue service if neither the trustee nor the

debtor, within 20 days after the date of the order for relief, furnishes adequate assurance of payment, in the form of a deposit or other security, for service after such date. On request of a party in interest and after notice and a hearing, the court may order reasonable modification of the amount of the deposit or other security necessary to provide adequate assurance of payment.
  11 U.S.C. § 366.

**10.** The debtor had become such a familiar figure around NSP's office that one of its employee's recognized her.

she was Kate Velden or that her previous address was not the same as Kathleen Belden's.[11]

On Friday, February 28, 1992, NSP forwarded the debtor's account for collection. On Monday, March 2, 1992, the debtor filed her present chapter 13 without any schedules or statements. The debtor concedes that the emergency filing was "precipitated by Northern States Power threatening to terminate my electrical service at my home, however, this filing was not made for the sole purpose of frustrating Northern States Power in terminating my electrical service...." (Response of Kathleen M. Belden, filed June 3, 1992, at p. 2.)

It is unclear whether the debtor has been paying any of her post petition NSP bills as they come due. The debtor did give NSP a $50.00 deposit for her current services but NSP applied that deposit to the current past due bill and the debtor's account was still $29.00 past due at the time of the hearing.

As a public utility NSP must follow specific regulations and procedures before it can disconnect service.[12] The procedure for terminating service can require several weeks after the customer defaults in payment. At a minimum, after NSP notifies the customer that it intends to disconnect service, NSP must wait 7 to 10 days for the customer to respond. If NSP does not receive a response within the appropriate time period, then NSP may disconnect services.

Additionally, NSP cannot refuse to provide services to a new address even if NSP disconnected services for the same customer at a previous address. NSP is limited to requesting a deposit from the customer,

but NSP provides services while it awaits the deposit payment. The deposit cannot exceed an estimated two months' gross bill or an existing two months' bill. Minn.R. 7820.4500. NSP must also provide the customer notice before it applies the deposit to a delinquent bill. *Id.* Therefore, it is possible that NSP could provide services for several months without receiving a deposit or payments from the customer before NSP could begin the disconnection procedures.

Furthermore, Minnesota statutes and rules regulate NSP's power to disconnect services during the cold weather months, October 15 through April 15. *See* Minn. Stat. § 216B.095, Minn.R. 7820.1800 and 7820.2100. NSP is prohibited from disconnecting services to a residential unit during the cold weather months if disconnecting services would affect the primary heat source for the unit and the customer has requested to participate in the inability to pay, ten percent plan or payment schedule programs. As a general policy NSP does not disconnect services if it would affect the primary heat source.

The debtor has a thorough understanding of NSP's policies, procedures and personnel. The debtor fails to pay her bills then files bankruptcy in the spring to halt its collection attempts after the cold weather months. Five of the debtor's nine bankruptcy cases were filed during the late winter or early spring. All but one of the debtor's chapter 13 cases were filed during the late winter or spring.

Three months after the debtor filed this case, NSP moved to dismiss the debtor's case and requested the court to prohibit the debtor from filing another bankruptcy case

---

**11.** The debtor had also set up a new account under the name "Paula Belden" in 1988.

**12.** Minn.R. 7820.1000 (1991) details nine permissible reasons to disconnect service with notice.

Minn.R. 7820.1100 (1991) details two permissible reasons to disconnect service without notice.

Minn.R. 7820.1300 (1991) details nonpermissible reasons to disconnect service.

Minn.R. 7820.1800 (1991) details restrictions for disconnecting service for occupied residential units.

Minn.R. 7820.1900 (1991) details the notice requirements that must be satisfied before disconnecting service. The notice requirements include information about inability to pay and ten percent plan programs.

Minn.R. 7820.2000—7820.3000 details the customer's rights with respect to appealing the inability to pay and ten percent plan decisions, budget counseling requirements, and payment schedules during cold weather months (October 15 through April 15) along with other disconnection requirements.

for five years due to the debtor's repetitive bankruptcy filings. In addition, NSP sought to have sanctions imposed against the debtor's attorney under Fed.R.Bankr.P. 9011(a), for filing the debtor's case when the debtor's circumstances have not improved since her last chapter 13 case was dismissed. NSP also objects to confirmation of the debtor's plan.

## DISCUSSION

In order to confirm her plan, the debtor must establish that the requirements of § 1325 have been satisfied.[13] The debtor testified that she has or will be able to satisfy all of these requirements.

NSP objects to confirmation of the debtor's plan on the ground that the debtor lacked good faith in proposing the plan, 11 U.S.C. § 1325(a)(3) and that the plan is not feasible, 11 U.S.C. § 1325(a)(6). NSP has also moved to dismiss the debtor's case for cause under 11 U.S.C. § 1307, for the debtor's lack of good faith in filing her bankruptcy case.[14]

■ For purposes of this order, I will consider the debtor's good faith, or lack thereof, under § 1307(c) and § 1325(a)(3)

**13.** Section 1325 provides in part:
   (a) Except as provided in subsection (b), the court shall confirm a plan if—
   (1) the plan complies with the provisions of this chapter and with the other applicable provisions of this title;
   (2) any fee, charge, or amount required under chapter 123 of title 28, or by the plan, to be paid before confirmation, has been paid;
   (3) the plan has been proposed in good faith and not by any means forbidden by law;
   (4) the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date;
   (5) with respect to each allowed secured claim provided for by the plan—
   (A) the holder of such claim has accepted the plan;
   (B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and
   (ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; or

together. Essentially, in a chapter 13 case the distinction between good faith in filing a case and good faith in proposing a plan is nominal since the plan is filed at the same time the case is filed.[15]

■ Since the phrase "good faith" is not defined in the bankruptcy code or explained in the legislative history, the Eighth Circuit has focused on "whether the plan constitutes an abuse of the provisions, purpose or spirit of Chapter 13." *United States v. Estus (In re Estus)*, 695 F.2d 311, 316 (8th Cir.1982). To make this determination, the Eighth Circuit suggested several factors to consider. These factors were:

(1) the amount of the proposed payments and the amount of the debtor's surplus;

(2) the debtor's employment history, ability to earn and likelihood of future increases in income;

(3) the probable or expected duration of the plan;

(4) the accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court;

   (C) the debtor surrenders the property securing such claim to such holder; and
   (6) the debtor will be able to make all payments under the plan and to comply with the plan.
   11 U.S.C. § 1325(a).

**14.** Section 1307(c) provides in part:
   (c) Except as provided in subsection (e) of this section, on request of a party in interest or the United States trustee and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title, or may dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause, ...
   11 U.S.C. § 1307(c). Courts have found that lack of good faith in filing a case constitutes cause under § 1307(c) to dismiss the case. *See: Gaudet v. Kirshenbaum Inv. Co. (In re Gaudet)*, 132 B.R. 670 (D.R.I.1991); *In re Novak*, 121 B.R. 18 (Bankr.W.D.Mo.1990); *In re Samuel*, 77 B.R. 520 (Bankr.E.D.Pa.1987).

**15.** In other situations the distinction between good faith in filing a case and good faith in proposing a plan may be important but it is not in this case.

(5) the extent of preferential treatment between classes of creditors;

(6) the extent to which secured claims are modified;

(7) the type of debt sought to be discharged and whether any such debt is nondischargeable in Chapter 7;

(8) the existence of special circumstances such as inordinate medical expenses;

(9) the frequency with which the debtor has sought relief under the Bankruptcy Reform Act;

(10) the motivation and sincerity of the debtor in seeking Chapter 13 relief; and

(11) the burden which the plan's administration would place upon the trustee.

*In re Estus*, 695 F.2d at 317. In 1984, the bankruptcy code was amended to add § 1325(b).[16] In a later case, the court found that this provision subsumed most of the *Estus* criteria. *Educ. Assistance Corp. v. Zellner (In re Zellner)*, 827 F.2d 1222, 1227 (8th Cir.1987). The court found that the good faith analysis now had a narrower focus and reduced the criteria to:

(1) whether the debtor has accurately stated debts and expenses,

(2) whether the debtor has mislead the court or made any fraudulent misrepresentations, and

(3) whether the Bankruptcy Code is being unfairly manipulated.

*Zellner*, 827 F.2d at 1227. Several years later, the Eighth Circuit again dealt with this good faith analysis and stated that although the § 1325(b) narrowed the focus of the analysis, *Zellner* preserved the "totality of circumstances" approach that the

*Estus* factors addressed. *Handeen v. LeMaire (In re LeMaire)*, 898 F.2d 1346, 1349 (8th Cir.1990) (*en banc*).

In considering the totality of the circumstances, the facts in this case demonstrate that the debtor did not file her case or propose her plan in good faith. This case is the debtor's ninth bankruptcy case and sixth chapter 13 case. In her first case in 1978, her discharge was vacated and deemed waived because of her failure to cooperate with the trustee, turn over property to the trustee, and her disregard of a series of court orders. The trustee initiated dismissal of all of the previous chapter 13 cases. There is a clear pattern: the debtor files a chapter 13 case, makes one or two minimal payments to satisfy the trustee at the time of confirmation or at his motion to dismiss. Then, the debtor's noncompliance with her plan resumes until the court finally dismisses the case.

No one has challenged the accuracy of the debtor's schedules and statements. The debtor has no secured claims and there is no objection to the debtor's treatment of her various classes of creditors. It does not appear that the debtor has any debt that would be nondischargeable in a chapter 7 case nor is there any indication of special circumstances or inordinate medical expenses.

NSP's objection revolves mainly around the debtor's motivation and sincerity in seeking chapter 13 relief. Although the debtor has many creditors, she admitted that this emergency filing was "precipitated by Northern States Power."

The debtor is familiar with NSP's policies and procedures and its desire to accommodate consumers. The debtor has set up

---

**16.** Section 1325(b) states:

(b)(1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—

(A) the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or

(B) the plan provides that all of the debtor's projected disposable income to be received in the three-year period beginning on the date that the first payment is due under the plan

will be applied to make payments under the plan.

(2) For purposes of this subsection, "disposable income" means income which is received by the debtor and which is not reasonably necessary to be expended—

(A) for the maintenance or support of the debtor or a dependent of the debtor; and

(B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.

11 U.S.C. § 1325(b).

new accounts with NSP under false names and social security numbers to evade paying her overdue NSP debt. After the debtor's fifth chapter 13 case was dismissed, the debtor paid NSP $72.00 to avoid its collection attempts. The next month, the debtor gave NSP another check but that check was returned for non-sufficient fund. Shortly after that check was returned, the debtor moved without leaving a forwarding address. It was after this disappearance, that the debtor again set up a new account using the name "Kathleen Velden" and a false social security number. The debtor convinced a new NSP employee to waive the required deposit for her most recent account. After some discussions with NSP management, the debtor did pay NSP a $50.00 deposit. That $50.00 has already been applied to the debtor's delinquent NSP bills that have accumulated during the present case. At the time of the hearing, the debtor still had an unpaid NSP bill for $29.00. This case was filed on the first business day after the debtor learned of NSP's eminent collection efforts. It is clear that the debtor's motivation in filing this case was to avoid NSP's attempt to disconnect her utility services.

I find that the debtor did not file this case or propose her plan in good faith.

■ I also find that the plan does not satisfy the feasibility requirement of 11 U.S.C. § 1325(a)(6). Section 1325(a)(6) requires that the debtor will be able to comply with the plan and make all payments under the plan. This chapter 13 plan is no more feasible than her previous chapter 13 plans.

The debtor's present plan provides that she will pay the trustee $65.00 each month for an unspecified number of years. The debtor's schedules reflect that her disposable income is $65.00 each month. Upon a closer examination of the debtor's listed expenses, it is clear that the debtor has not budgeted sufficient money to cover her existing living expenses. The debtor has budgeted only $20.00 each month for clothing expenses and $150.00 each month for food for her son and herself. The debtor has not budgeted any money for recreation, entertainment, newspaper, magazines or the like. It is unlikely that the debtor will have even $65.00 each month to pay to the trustee under her plan. It appears that the debtor has such severe financial problems because she is just not earning enough income to cover her basic living expenses. The debtor has been unemployed and changed jobs several times since 1978. Her employment outlook is bleak. She is presently working for a temporary secretarial agency but she has only worked with this agency since the beginning of the year. The debtor is attempting to secure permanent employment and she sends out resumes every week but has been unsuccessful in finding a job during these difficult economic times. The debtor will not be able to make her plan payments. The debtor's plan is not feasible.

The debtor claims that she now understands the importance of complying with her plan, but the debtor has not demonstrated that understanding. It is obvious that the debtor has learned how the bankruptcy system works since she first experimented with bankruptcy in 1978. However, the debtor did not establish that she is able to work within the system and comply with her present chapter 13 plan.

The debtor testified that she intends to comply with her 1992 plan for the duration of the plan but she also testified that she "had the intention" to complete her 1991 chapter 13 plan but was unable to because "it was financial at the time". The debtor did not explain what those financial problems were or what factors have changed since the 1991 case. The debtor testified about her intent to comply with her present plan but there was no evidence concerning her ability to complete the present plan or her inability to complete her previous plans. The debtor's unsecured debts have substantially increased over the years, but her income and expenses have remained relatively stable. The debtor did not establish that she is in a better position to comply with her present plan than she was with her previous plans when she had similar income and expenses.

Additionally, the debtor's employment history is spotty. The debtor has held several different secretarial jobs since 1982. The debtor's bankruptcy history reflects that she made virtually no payments on her previous chapter 13 plans when she had a permanent job. She is currently employed by a temporary secretarial agency but her schedules reflect that she has only worked with this agency since the beginning of this year. The debtor testified that the agency knows she is willing and able to work 40 hours a week but there is no indication that the agency can provide her with a consistent 40 hour work week. The debtor just did not explain how she will be able to make all the plan payments and comply with the plan when her situation is more tenuous now than in the past when she was unable to comply with her plans.

Like other addicts, the debtor has grown dependent upon bankruptcy cases in general and chapter 13 cases in particular. She is entitled to a dose of chapter 7 only once every six years and in between chapter 13 is her drug of choice. Like other drugs, when applied in the proper dosage and properly administered, bankruptcy provides appropriate relief in the form of a fresh start. However, like other drugs, when abused, bankruptcy provides no relief but only a temporary escape. I have some sympathy for the debtor's predicament as I would for anyone with any addiction. The addiction is probably not entirely of her own making. However, my sympathy does not lead me to allow her to continue to abuse bankruptcy, but leads me rather to withhold it. Of course, until she understands what her financial problems are and addresses them, the inability to file bankruptcy will be painful.

■ NSP requests that the court prohibit the debtor from filing another bankruptcy case for five years, but NSP does not cite any statutory provision that supports such a prohibition. 11 U.S.C. § 349, dealing with the effect of dismissal, provides:

(a) Unless the court, for cause, orders otherwise, the dismissal of a case under this title does not bar the discharge, in a later case under this title, of debts that were dischargeable in the case dismissed; nor does the dismissal of a case under this title prejudice the debtor with regard to the filing of a subsequent petition under this title, except as provided in section 109(f) [17] of this title.

11 U.S.C. § 349(a).

Courts are divided over whether or not the introductory language "unless the court, for cause, orders otherwise" modifies the entire section or only the clause before the semicolon. An exact application of correct grammar would probably dictate that the introductory language does not modify the second clause regarding filing of subsequent petitions. However, I read this statute to allow the court to "order otherwise" as to the filing of a subsequent petition. The second clause regarding subsequent petitions was not in the original statute but rather was added in 1984 by the Bankruptcy Amendments and Federal Judgeship Act of 1984, Public Law 98–353. I take it to be an oversight in draftsmanship that that language was added in such a way that the introductory language about the court order otherwise would not apply to the new language, especially since it applies to the original provisions of subparagraph a and to all of the provisions of subsection b.

Thus, I conclude that as part of dismissing this case, I can prejudice the debtor with regard to the filing of a subsequent petition.

■ While the debtor is technically not currently disqualified from filing a chapter 7 case, she may not receive a discharge in a chapter 7 case unless that case is filed after November 10, 1994, more than six years after she filed her last chapter 7 petition. Thus, as a practical matter, there is no reason for the debtor to file a chapter 7 case before that time. Since the debtor is ineligible for chapter 12 and a chapter 11 case makes absolutely no sense for her, the issue of future cases in the next two years revolves around her ability to continue to file chapter 13 cases. They present the

---

**17.** Sic, should read § 109(g).

greatest temptation for abuse since they allow the debtor an automatic right to dismissal and have procedures which make involuntary dismissal a cumbersome and drawn out process. Since it is primarily chapter 13 that the debtor abuses, I think that prohibiting her from filing a chapter 13 case or any other case until she is meaningfully eligible to file a chapter 7 case again is an appropriate remedy, creating a hiatus in which hopefully the debtor can resolve her financial problems and eliminate her dependency on bankruptcy.

■ NSP also moved to sanction the debtor's attorney under Fed.R.Bankr.P. 9011(a) for filing the debtor's case.[18] NSP argues that Ronbeck should have known that the debtor's circumstances had not sufficiently changed since the debtor's last chapter 13 case was dismissed, and that the case was filed to harass or cause unnecessary delay in NSP's collection efforts. The present chapter 13 case was filed without lists, schedules, or a plan on the first business day after the debtor received notice of NSP's collection efforts. I agree that Ronbeck made an insufficient inquiry into the facts of the debtor's financial situation before he signed her petition. Although

courts have used Rule 9011 to impose monetary sanctions on parties or attorneys for repeated or abusive filings,[19] I find that the unpaid fees and expenses Ronbeck has incurred in representing the debtor in her previous filing and during this case are sufficient to cause him to reconsider continuing this practice of repetitive filings for clients who are abusing the system.

THEREFORE, IT IS ORDERED:

1. Confirmation of the debtor's plan filed on March 17, 1992, is denied.

2. This case is dismissed.

3. The debtor may not file another bankruptcy case before November 11, 1994.

4. Jeffrey S. Ronbeck may not collect from the debtor any attorneys' fees or costs incurred in representing her in any of her bankruptcy cases.

---

**18.** Rule 9011(a) provides in part:

   **(a) Signature.** Every petition, pleading, motion and other paper served or filed in a case under the Code on behalf of a party represented by an attorney, ... shall be signed by at least one attorney of record in the attorney's individual name.... The signature of an attorney or a party constitutes a certificate that the attorney or party has read the document; ... and that it is not inter-

posed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation or administration of the case.
Fed.R.Bankr.P. 9011(a).

**19.** *See Gaudet v. Kirshenbaum Inv. Co. (In re Gaudet),* 132 B.R. 670 (D.R.I.1991). *Snow v. Jones (In re Jones),* 41 B.R. 263 (Bankr.C.D.Cal. 1984).