**In re Carl LARSON, Debtor.**

**Bankruptcy No. 99–44177.**

United States Bankruptcy Court, D. Minnesota.

March 7, 2000.

Barbara J. May, Arden Hills, MN, for Debtor.

Jasmine Keller, Chapter 13 Trustee, Minneapolis, MN, for Trustee.

Mark A. Olson, Olson Law Office, Burnsville, MN, for Objecting Creditor.

## ORDER DENYING CONFIRMATION AND DISMISSING CASE

NANCY C. DREHER, Bankruptcy Judge.

The above-entitled matter came on before the court for an evidentiary hearing regarding confirmation of the Debtor's Chapter 13 plan and objections thereto on January 31, 2000. Barbara May appeared on behalf of the Debtor. Mark Olsen appeared on behalf of the objecting creditor, Wholesale Insulation Supply Co. Based upon all the records and proceedings herein, the court makes the following:

### FINDINGS OF FACT

1. The Debtor, Carl Larson ("Debtor"), is 58 years old and married. He is currently suffering from a serious bone infection in his leg that has required numerous medical and surgical procedures in an attempt to avoid amputation. The Debtor is not currently employed, but he receives $344.00 per month in disability insurance benefits. The Debtor and his wife maintain separate bank accounts and generally do not hold their assets jointly. The Debtor's wife, by virtue of her larger income, pays most of the household expenses.

2. In 1989, the Debtor incorporated his business known as Carl Larson Insulation

(the "Corporation"). The books and records of the Corporation were not available at the hearing, the Debtor claiming that they had been destroyed in a flood in the basement of his home. I give little weight to this assertion as the Debtor was able to give information about the gross earnings of the business for 1994, but was unable to give the source for that information. In order to obtain such information, he necessarily had to look at the very records that he claims were lost in the flood. Despite the lack of records, it appears that the business was not very profitable, leaving the Debtor with very little income in 1994 ($13,200.00) and 1995 ($3,120.00).

3. In 1992 the Debtor began purchasing products from the objecting creditor, Wholesale Insulation Supply Co. ("Wholesale Insulation"), through the Corporation. At that time, the Corporation and Wholesale Insulation entered into a credit agreement, which required payment on all purchases 30 days from the date of delivery. The Debtor also signed the agreement under the heading "Personal Guaranty." However, the Debtor claims to have signed the guaranty provision solely in a corporate capacity.

4. At first the Debtor made payments within 30–45 days after delivery, but as time went on, he often needed more than 45 days. Wholesale Insulation frequently had to prod him to make payments. In July of 1994, his balance stood at $29,325.00 with approximately $8,000.00 past due. When the balance increased to approximately $65,000.00 in August, Wholesale Insulation talked to the Debtor about decreasing the balance. At that point, about $9,000.00 was past due. From then on, Wholesale Insulation required the Debtor to pay cash for any new purchases.

5. In March of 1995, Debtor's balance had decreased to $45,000.00, but more than $38,000.00 was past due. Since July of 1994, the Debtor's balance had increased by more than his net income for the entire year. In short, the Debtor was running up his debt despite a failing business and with no apparent ability or intent to repay the loan.

6. Beginning in April of 1995, Wholesale Insulation instituted a new payment plan for the Debtor. It still required the Debtor to pay for all new purchases in cash, but also required the Debtor to pay an additional amount, equal to half of the amount purchased, to reduce the balance due. After the establishment of this condition, the Debtor only made approximately $4,000.00 more in purchases. He made no new purchases after May of 1995. The business closed soon thereafter, and all of the assets of the Corporation were sold. Although Wholesale Insulation had a security interest in the assets, it did not receive notice of the liquidation until after the fact.

7. In September of 1995, Wholesale Insulation brought suit against both the Debtor and the Corporation for the unpaid balance under the credit agreement. Despite his assertion that he was not personally liable on the credit agreement, the Debtor did not answer the complaint. Judgment was entered on October 22, 1996, against both the Debtor and the Corporation in the amount of $53,750.00 plus $1,500.00 in attorney's fees and costs.

8. In the course of pursuing the judgment, Wholesale Insulation discovered the Debtor's prior ownership of a lake home in Cass County, Minnesota. The property consists of 7.3 acres of land, including approximately 500 feet of shoreline, and a four-season cabin. In 1998, the assessed value of the property for tax purposes was $38,000.00.

9. The Debtor and his wife had purchased the home in 1991 for $20,000.00. They paid $6,000.00 as a down payment and financed the remaining amount through a contract for deed. The Debtor obtained $5,000.00 of the down payment, and his wife contributed the remaining $1,000.00.

10. The monthly payments on the contract for deed were $289.00, which the

Debtor paid from his funds until April of 1995. At that point, which coincided with the second meeting between Wholesale Insulation and the Debtor about reducing his balance, the Debtor and his wife met with an attorney to transfer the property to the Debtor's mother-in-law, Cecilia Overkamp ("Overkamp"). The Debtor alleges that the property served as security for a loan that Overkamp had made to the Debtor and/or his wife and/or the Corporation in 1994. This loan was evidenced by two very different promissory notes. The first, dated April 15, 1994, indicated that both the Debtor and his wife were liable and promised to repay the $15,000.00 loan plus four percent interest on October 15, 1994. The second note, dated August 25, 1994, states that the money was borrowed in February of 1994. It indicates that only the Debtor is liable, but his wife signed as a guarantor. This note also includes a payment schedule and indicates that the loan is secured by the lake home. Although the two notes indicate that the Debtor and his wife are liable, their testimony at the hearing suggested that the Corporation actually borrowed the money.

11. The Debtor and his wife transferred their interest in the contract for deed to Overkamp on April 13, 1995. On the same date they filed a quit claim deed reflecting the transfer. There is no written evidence that the contract for deed holder approved of the transfer as required by that document. At the time of the transfer, the Debtor and his wife had $14,000.00 in equity in the property, assuming no increase in value from the date of purchase. They allege that they still owed Overkamp $11,000.00.

12. After the transfer, the Debtor and his wife continued to use the property in the same manner as before. They regularly visited the property on the weekends and, occasionally, for a week's vacation. Overkamp visited, at most, two times. Debtor's wife made all subsequent payments on the contract for deed, as well as all insurance payments, all property tax payments, and all utility payments. Ultimately, the Debtor's wife paid off the contract for deed in January of 1997. In total, she paid approximately $5,600.00 toward the contract for deed. The amount she paid for taxes and other expenses was not specified.

13. After the final payment on the contract for deed, Overkamp assigned her interest solely to the Debtor's wife. A quit claim deed reflecting the transfer was filed on February 20, 1997. The Debtor's responsive papers indicated that this second transfer was in exchange for the Debtor's wife agreeing to pay Overkamp's nursing home expenses. At the hearing, however, the testimony suggested that the transfer was just an attempt by Overkamp to "clean up her affairs" by transferring her property to her only daughter before her death. The contract for deed holders filed a warranty deed on August 6, 1997, transferring fee title solely to the Debtor's wife.

14. There is no evidence to show any transfer of money by Overkamp to the Debtor, his wife, or the Corporation. Further, there is no evidence of any payments to Overkamp in payment on the debt. The transfer of the lake property to Overkamp is not reflected in the Debtor's tax records. The lack of evidence is suspicious given the availability of other financial records from the same time period. Although the lack of evidence is not conclusive, I find it likely that no loan ever occurred between the Debtor and Overkamp, especially in light of Debtor's lack of credibility with respect to the missing records of the Corporation.

15. Wholesale Insulation brought suit against the Debtor's wife for fraudulent transfer in September of 1998. While that litigation was pending, the Debtor filed his bankruptcy petition on August 3, 1999. The fraudulent transfer action has been put on hold pending the resolution of this matter.

16. Despite his meager $344.00 monthly income, the Debtor proposes to pay $188.00 per month for 60 months in his

Chapter 13 plan. After administrative expenses, the creditors will receive $10,-152.00. All secured claims are to be paid outside of the plan. Thus, the $10,152.00 will be divided pro rata among the unsecured creditors. Aside from Wholesale Insulation's judgment, the Debtor has very few debts. The filed claims total $1635.04. Accordingly, Wholesale Insulation's judgment represents well over 98 percent of the claims against the Debtor.

## CONCLUSIONS OF LAW

■ Section 1325 of the Bankruptcy Code provides the requirements for confirmation of a Chapter 13 plan. In relevant part, the plan must meet the best interests of creditors test and the good faith test. 11 U.S.C. § 1325(a)(3), (4) (1994). The court is obligated to ensure that each plan meets these requirements regardless of whether any creditor objects.[1] *In re Campbell*, 242 B.R. 327, 329 (W.D.Va.1999) *In re Evans*, 242 B.R. 407, 411 (Bankr. S.D.Ohio 1999); *In re Conner*, 242 B.R. 794, 797 (Bankr.D.N.H.1999); *In re Mammel*, 221 B.R. 238, 239 (Bankr.N.D.Iowa 1998); *In re Games*, 213 B.R. 773, 775–76 (Bankr.E.D.Wash.1997); *In re Ruggles*, 210 B.R. 57, 59 (Bankr.D.Vt.1997).

■ The best interests of creditors test requires that:

the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date.

11 U.S.C. § 1325(a)(4). The Debtor's plan proposes to pay each unsecured creditor its pro rata share of $10,152.00. I must, therefore, determine whether the creditors would receive more than that amount in a Chapter 7 liquidation. In doing so, I must look not only at the Debtor's assets as listed on his schedules, but I must also consider the recovery of assets by the trustee through fraudulent transfer and preference actions. *See, e.g., In re Future Energy Corp.*, 83 B.R. 470, 489 n. 33 (Bankr.S.D.Ohio 1988).

1. In this case Wholesale Insulation filed an objection to confirmation, arguing that the plan was not filed in good faith and did not meet the best interests of creditors test. The Debtor did not object to Wholesale Insulation's standing, and any objection at this point may be untimely. *See In re Turpen*, 218 B.R. 908, 912 (Bankr.N.D.Iowa 1998) (debtor must object to standing prior to hearing on confirmation so that the creditor is prepared to put on some evidence of its status). However, even if the standing issue had been raised, I find that Wholesale Insulation does have standing.

Wholesale Insulation failed to timely file a formal proof of claim. Only "parties in interest" may object to confirmation of a plan. 11 U.S.C. § 1324 (1994). Without an allowed claim, most courts hold that a party generally does not have the requisite pecuniary interest to be a "party in interest." *E.g., In re Dennis*, 230 B.R. 244, 255 (Bankr.D.N.J.1999); *In re Stewart*, 46 B.R. 73, 77 (Bankr.D.Or.1985); *In re Sheppard*, 173 B.R. 799, 806 (Bankr. N.D.Ga.1994). However, Wholesale Insulation timely filed its objection to the plan, and such objection may serve as an informal proof of claim. *Stewart*, 46 B.R. at 76. To qualify as an informal proof of claim, the document must state the nature and amount of the claim as well as indicate the claimant's intent to hold the debtor liable and pursue the claim. *First Am. Bank & Trust v. Butler Machinery Co. (In re Haugen Constr. Servs., Inc.)*, 876 F.2d 681, 682 (8th Cir.1989); *In re Phillips*, 166 B.R. 129, 131–32 (Bankr.S.D.Iowa 1994). Wholesale Insulation's objection to confirmation meets these requirements. It states that Wholesale Insulation holds a judgment in the amount of $53,752.32 and indicates its intent to pursue the claim by objecting to the amount it would receive under the proposed plan. Therefore, Wholesale Insulation has standing to object to confirmation based upon its informal proof of claim.

Furthermore, Wholesale Insulation could file a late-filed proof of claim. In general, late-filed claims must be disallowed in Chapter 13 cases if there is an objection. *In re Dennis*, 230 B.R. 244, 249 (Bankr.D.N.J. 1999). However, the plan in this case specifically provides for payment to late-filed claims, thus negating the general rule requiring disallowance of such claims. Therefore, the filing of a late-filed claim under the circumstances of this case must also give Wholesale Insulation standing to object to the plan.

■ The issue in this case is whether a trustee could be reasonably expected to succeed in setting aside the transfers between the Debtor, his wife, and Overkamp. *In re Carter,* 4 B.R. 692, 693 (Bankr. D.Colo.1980). Bankruptcy Code § 544(b)(1) provides that "the trustee may avoid any transfer of an interest of the debtor in property ... that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title ...." 11 U.S.C. § 544(a)(1).[2] The applicable law in this case is Minn.Stat. § 513.44, which is Minnesota's fraudulent transfer statute. It provides:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(ii) intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

Minn.Stat. § 513.44(a). In determining whether the debtor acted with an actual intent to defraud, the statute provides that the court may consider the following factors:

(1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was disclosed or concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Minn. Stat. § 513.44(b). These factors are the so-called "badges of fraud." *Citizens State Bank v. Leth,* 450 N.W.2d 923, 927 (Minn.Ct.App.1990).

■ As noted above, I need not determine whether the transfer at issue actually constitutes a fraudulent transfer that must be set aside. *Carter,* 4 B.R. at 694. Rather, I need only reach the conclusion that a Chapter 7 trustee could be reasonably expected to succeed in setting aside the transfer. *Id.* at 693–94. To do so, I must consider the requirements of Minn.Stat. § 513.44.

■ In this case, it appears that a trustee would likely succeed in establishing that the Debtor made the transfer with an actual intend to hinder, delay, or defraud

**2.** Bankruptcy Code § 548 does not apply in this case because the transfer occurred more than one year prior to the filing of the bankruptcy petition. 11 U.S.C. § 548(a)(1).

his creditors as prohibited by Minn.Stat. § 513.44(a)(1). Numerous of the "badges of fraud" are present. For instance, (1) the transfer was made to the Debtor's mother-in-law; (2) the Debtor and his wife continued to use the property in the same manner they had used it prior to the transfer, and Overkamp did not use it at all; (3) the Debtor's wife continued to pay the contract for deed payments as well as all expenses related to the property; (4) the Debtor had been threatened with suit by Wholesale Insulation at almost precisely the same time the transfer took place; (5) given the lack of evidence showing the receipt of $15,000 from Overkamp, it is likely that the Debtor received no value in exchange for the transfer of the property; (6) there is no documentary evidence of any amount paid by the Debtor's wife on behalf of Overkamp in consideration for the transfer back to the Debtor's wife in February of 1997; (7) the transfer occurred shortly after the Debtor had run up his debt to Wholesale Insulation at a time when it appeared that he had no ability to repay the debt; and (8) the transfer occurred less than two months before the Debtor's business ultimately failed. *Cf.* Minn.Stat. § 513.44(b). Under the circumstances of this case, I find it likely that a Chapter 7 trustee would succeed in setting aside the transfer.

Having so found, I must still determine whether setting aside the transfer of the property would generate a greater recovery for the unsecured creditors than the $10,152.00 proposed in the Debtor's plan. The lake property's assessed value for tax purposes is $38,000.00. While that value may be low, it still allows for a greater recovery to the unsecured creditors than they would receive under the Debtor's Chapter 13 plan. The Debtor contributed approximately 67 percent of the funds towards the purchase of the property. However, even assuming that he only had a 50 percent interest, $19,-000.00 would be available in a Chapter 7 liquidation. Although this amount would be reduced by administrative expenses, it is clear that more than $10,152.00 would remain available for the payment of unsecured creditors. Accordingly, confirmation must be denied because the plan does not meet the best interests of creditors test.

I will also consider the Debtor's good faith in proposing this plan. 11 U.S.C. § 1325(a)(3). The Eighth Circuit has adopted a totality of the circumstances approach in determining whether a plan has been proposed in good faith. *Handeen v. LeMaire (In re LeMaire)*, 898 F.2d 1346, 1349 (8th Cir.1990). Typically, the court must focus on whether there has been an unfair manipulation of the Bankruptcy Code. *In re Kurtz*, 238 B.R. 826, 829 (Bankr.D.N.D.1999). The ultimate question is whether the debtor is attempting to thwart his creditors or is making an honest attempt to repay them. *In re Mattson*, 241 B.R. 629, 637 (Bankr.D.Minn. 1999).

Courts must be especially careful in determining whether there has been an unfair manipulation of the Code when a substantial portion of the claims to be discharged in the Chapter 13 case would not be dischargeable in a Chapter 7 case. *Kurtz*, 238 B.R. at 829–30. If this were a Chapter 7 case, on the basis of the facts known to the court at this time, the debt to Wholesale Insulation, which represents more than 98 percent of the claims against the Debtor, would quite possibly be nondischargeable under § 523(a)(2)(A) as a debt incurred by fraud. I reach this conclusion because the Debtor incurred this debt at a time when his business was clearly failing, and he had no apparent intent or ability to repay it. The nondischargeable nature of the debt, coupled with the fact that the Debtor would not have been in need of bankruptcy relief but for the judgment of Wholesale Insulation, requires the court to carefully scrutinize whether the plan demonstrates a sincere effort by the Debtor to repay his creditors.

*Kurtz,* 238 B.R. at 830; *see also Mattson,* 241 B.R. at 637.

At first glance, it may appear that the Debtor is sincere in his efforts to repay his creditors given the large portion of his monthly income that he proposes to pay into the plan. As discussed more fully above, however, the evidence strongly suggests that the Debtor transferred the lake property to Overkamp with the actual intent to hinder, delay, or defraud his creditors. The fact that he is attempting to readjust the debt of Wholesale Insulation without accounting for the one asset that it could recover outside of bankruptcy weighs strongly against finding the Debtor's effort at repayment to be sincere. Indeed, the potential fraudulent nature of the transfer was likely another factor that motivated the Debtor to seek Chapter 13 rather than Chapter 7 relief. *Kurtz,* 238 B.R. at 830. Furthermore, it is likely that the Debtor intended to forestall the action against the Debtor's wife by filing the bankruptcy petition. This is yet another factor weighing against the Debtor's good faith. *Carter,* 4 B.R. at 693.

In sum, it appears that the Debtor is attempting to thwart his creditors rather than making an honest attempt to repay them. *Kurtz,* 238 B.R. at 830–31; *see also Mattson,* 241 B.R. at 637. Based on the totality of the circumstances, including the nature of the debt and the transfer of the lake property, I find that the Debtor's Chapter 13 plan was not proposed in good faith, and confirmation must be denied on that basis as well.

■ ■ ■ Bankruptcy Code § 1307(c) allows the court to dismiss a Chapter 13 case for cause. 11 U.S.C. § 1307(c). Numerous courts have held that filing a Chapter 13 petition in bad faith is cause for dismissal under § 1307(c). *E.g., Molitor v. Eidson (In re Molitor ),* 76 F.3d 218, 220 (8th Cir.1996); *Mattson,* 241 B.R. at 635; *In re Buchanan,* 225 B.R. 672, 673 (Bankr.D.Minn.1998). The difference between good faith in proposing a plan and good faith in filing a case is nominal.

*Mattson,* 241 B.R. at 635; *Buchanan,* 225 B.R. at 673; *In re Belden,* 144 B.R. 1010, 1019 (Bankr.D.Minn.1992). Indeed, the Eighth Circuit has articulated the same standard for finding bad faith in both instances. *Compare Molitor,* 76 F.3d at 220–21 *with Handeen v. LeMaire (In re LeMaire ),* 898 F.2d 1346, 1349 (8th Cir. 1990).

■ ■ ■ Based upon all the factors that led me to conclude that the Debtor did not propose his plan in good faith, I also conclude that the Debtor did not file his Chapter 13 petition in good faith. Accordingly, I will dismiss the Debtor's Chapter 13 case for cause pursuant to 11 U.S.C. § 1307(c).

ACCORDINGLY, IT IS HEREBY ORDERED THAT:

1. Confirmation of the Debtor's Chapter 13 plan is DENIED;

2. The Debtor's Chapter 13 bankruptcy case is DISMISSED.