**In re Charles K. SOOST, Debtor.**

No. 02–91634.

United States Bankruptcy Court,
D. Minnesota,
Third Division.

March 6, 2003.

See also 262 B.R. 68.

120

David F. Frundt, Blue Earth, MN, for Debtor.

Donald W. Savelkoul, Albert Lea, MN, for NAH, Inc., d/b/a Nordaas American Homes ("NAH").

## ORDER DENYING CONFIRMATION OF PLAN AND DISMISSING CASE

GREGORY F. KISHEL, Chief Judge.

This Chapter 13 case came on before the Court on November 27, 2002, for an evidentiary hearing on the confirmation of the Debtor's Fifth Modified Plan. The Debtor appeared personally and by his attorney, David F. Frundt. NAH, Inc., d/b/a Nordaas American Homes ("NAH") appeared by its attorney, Donald W. Savelkoul. Upon the evidence received at the hearing and the arguments and memoranda of counsel, the Court memorializes the follow-ing decision pursuant to Fed.R.Civ.P. 52(a) and Fed. R. Bankr.P. 9014.

## THE PARTIES AND THEIR HISTORY

This is the Debtor's second bankruptcy case in a period of about two years. The first, BKY00–32294, was commenced and concluded under Chapter 7. Before the case at bar, however, the Debtor had a history with NAH that ran with some intensity through a state court lawsuit and the prior bankruptcy case.

The Debtor has worked in building construction, repair, and maintenance since 1972, mainly as a carpenter. In 1997, the Debtor contracted to erect a shop building south of Wells, Minnesota, for his cousin. He purchased a substantial quantity of the material from NAH, on short-term credit. When the Debtor did not fully pay this account, NAH sued him in the Minnesota state courts. On February 1, 1999, it recovered a default judgment against the Debtor in the sum of $12,248.74. In response to NAH's post-judgment enforcement procedures, the Debtor disclosed that he held an interest in certain non-homestead real estate in Waseca County.

NAH's counsel then docketed his client's judgment in Waseca County, giving rise to a lien against the Debtor's real estate under Minn.Stat. § 548.09. The Sheriff of Waseca County scheduled a sale of the real estate in enforcement of the judgment lien. On May 22, 2000—one day before the date set for the sale-the Debtor filed a petition for relief under Chapter 7.

In his Schedule C for that case, the Debtor claimed an interest in the Waseca County real estate as exempt pursuant to 11 U.S.C. § 522(d)(5), to the extent of a stated value of $1.00. In late September, 2000, the Debtor filed a motion under 11 U.S.C. § 522(f)(1), seeking an order avoiding NAH's judgment lien in its entirety. On November 1, 2000, the Court (O'Brien,

J.) issued a written order denying the motion.

The Debtor then took an appeal to the Bankruptcy Appellate Panel for the Eighth Circuit. After oral argument on May 2, 2001, the B.A.P. issued an opinion affirming Judge O'Brien's order. *In re Soost*, 262 B.R. 68 (8th Cir. BAP 2001).

Then, for nearly a year, NAH's counsel made entreaties to the Debtor to commence payment or to settle. When this effort was unavailing, NAH set on another sheriff's sale to enforce its judgment lien, for June 28, 2002. On the day before that, the Debtor filed the petition that commenced this case.

### THE DEBTOR'S PLAN

Presently before the Court for confirmation is the fifth modification of the Debtor's plan, filed on November 7, 2002. Under its terms, the Debtor proposes to make monthly payments of $334.11 to the Standing Trustee over sixty months, and to make a "final...balloon payment...in the 60th month of the plan" in the amount of $10,067.48. From the funds so garnered, the Trustee would pay attorney fees of $1,000.00 to the Debtor's counsel, and would pay two relatively small state and federal income tax claims. All three of those claims would be amortized over the full sixty months of the plan. The holders of general unsecured claims (which the Debtor estimated to total $7,109.00) would receive nothing in distribution.

The balance of the Trustee's receipts, after payment of her compensation, would be applied to the claims of NAH and Marjorie Soost, the Debtor's mother. These claimants would receive monthly payments of $121.46 each over the full sixty-month period, with enhanced payments of $1,000.00 per year to each, on the annual anniversary date of the commencement of payments. The unsatisfied balance on each stated claim would come due and be paid in month 60.

The Debtor classifies both of these claims as secured claims, NAH's by virtue of its judgment lien and his mother's under a mortgage originally given in 1986 to his now-deceased father. The Debtor proposes to write down the amount of NAH's claim that would be treated as secured; the reduction of about $2,000.00 is apparently the result of an application of 11 U.S.C. § 506(a) to the stated $26,000.00 value of the Waseca County real estate.[1] In the plan, the Debtor recites that he "has ability to make yearly $1,000.00 payments based on current employment." The ending balloon payments are to be funded by "future anticipated income," or the proceeds of sale of "a portion of real property" if that were necessary.

### NAH'S OBJECTION TO CONFIRMATION AND REQUEST FOR DISMISSAL

NAH objected to the confirmation of the Debtor's original plan on two stated grounds. It maintains that objection as to the current modification of the plan. As its primary argument, NAH maintains that the Debtor has not proposed a plan in good faith, as required by 11 U.S.C. § 1325(a)(3). In the alternative, it argues that the Debtor cannot meet the feasibility requirement of 11 U.S.C. § 1325(a)(6). It also seeks dismissal of this case, if the Court denies confirmation on either or

---

1. In pertinent part, this statute provides:
 An allowed claim of a creditor secured by a lien on property in which the estate has an interest...is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property...and is an unsecured claim to the extent that the value of such creditor's interest...is less than the amount of such allowed claim.

both of those grounds. These issues should be treated seriatim.

## ANALYSIS

### I. Objection to Confirmation.

#### A. Good Faith.

##### 1. Standard under the statute.

■■■ The debtor proposing a plan under Chapter 13 must show that "the plan has been proposed in good faith..." 11 U.S.C. § 1325(a)(3). This is an issue of fact. *Noreen v. Slattengren*, 974 F.2d 75, 77 (8th Cir.1992); *In re LeMaire*, 898 F.2d 1346, 1349–1352 (8th Cir.1990) (*en banc* ); *In re Banks*, 248 B.R. 799, 803 (8th Cir. BAP 2000), *aff'd*, 267 F.3d 875 (8th Cir. 2001); *In re Nielsen*, 211 B.R. 19, 21 (8th Cir. BAP 1997); *In re Bayer*, 210 B.R. 794, 795 (8th Cir. BAP 1997). In passing on this requirement, the court must consider the totality of the circumstances surrounding the filing of the petition and the presentation of the plan. *Noreen v. Slattengren*, 974 F.2d at 76; *In re LeMaire*, 898 F.2d at 1348. *See also Education Assistance Corp. v. Zellner*, 827 F.2d 1222, 1227 (8th Cir.1987), which modified the standard recited in *In re Estus*, 695 F.2d 311, 316 (8th Cir.1982); *In re Nielsen*, 211 B.R. at 22.

■■■ The broader inquiry is "whether the Bankruptcy Code is being unfairly manipulated" by the debtor, *Education Assistance Corp. v. Zellner*, 827 F.2d at 1227, or put another way, "whether the plan constitutes an abuse of the provisions, purpose, or spirit of Chapter 13," *In re Estus*, 695 F.2d at 317. Though the words "good faith" suggest a subjective state of mind, the courts can consider objectively-manifested circumstances to make an inference on the existence or non-existence of this element. The relevant factors include the debtor's candor and honesty with the court in the bankruptcy case; the conformity of the plan with the policy goals of the bankruptcy laws; the debtor's expressed attitude, past and present, toward the legal process and its values; the extent to which the debtor's past conduct conformed with the substantive law that governed his relationship(s) with creditor(s); and the debtor's past conduct in relation to the integrity of the legal system. The court may consider the fundamental fairness of the debtor's proposed treatments of creditors' claims. *Id.* See also *In re LeMaire*, 898 F.2d at 1349; *In re Estus*, 695 F.2d at 315; *In re Banks*, 248 B.R. at 803 n. 2; *In re Barger*, 233 B.R. 80, 83 (8th Cir. BAP 1999) (applying identical language of 11 U.S.C. § 1225(a)(3)).

Another relevant factor is the debtor's pre-bankruptcy conduct toward specific creditors treated under the plan, whether it occurred in the context of legal proceedings or not. *In re LeMaire*, 898 F.2d at 1352; *In re Barger*, 233 B.R. at 84; *In re Bayer*, 210 B.R. at 795–796. The court must consider the way in which the debtor has commenced and prosecuted his Chapter 13 case: "whether the debtor has stated debts and expenses accurately [, and] whether the debtor has made any fraudulent misrepresentations to mislead the bankruptcy court." *In re Barger*, 233 B.R. at 83 (citing *Noreen v. Slattengren*, 974 F.2d at 76, and *In re LeMaire*, 898 F.2d at 1349); *In re Bayer*, 210 B.R. at 796. A finding of bad faith may be warranted where a judgment creditor's claim is "the only significant debt to be dealt with" under the debtor's plan, the debtor filed for Chapter 13 relief after that creditor's attempted enforcement of its state-court judgment against him, and other facts and circumstances indicate improper motive. *Noreen v. Slattengren*, 974 F.2d at 76–77; *In re Banks*, 248 B.R. at 802 and 267 F.3d at 875; *In re Larson*, 245 B.R. 609, 616–

617 (Bankr.D.Minn.2000); *In re Sitarz*, 150 B.R. 710, 721 (Bankr.D.Minn.1993).

### 2. Application.

In the case at bar, the debtor did not propose his plan in good faith. A significant number of facts and circumstances support this inference.

### a. The Debtor's lack of consistency and truthfulness in the courts.

 The Debtor and NAH have now been involved in three different proceedings in two different courts. Over their span, the Debtor has avowed a wide range of different factual positions on a central issue: the amount of the debt chargeable against the Waseca County real estate on account of encumbrances, and the resultant value of his interest in it.

On April 29, 1999, the Debtor completed his "UCF–22 Financial Disclosure Form" in NAH's post-judgment collection procedures in the state court. In it, he recited that the Waseca County real estate had an "Amount Owed" to Margie Soost of $12,800.00.

In the Schedule A that he filed on May 31, 2000, for his Chapter 7 case, he recited $26,000.00 as the current market value of the Waseca County real estate, and $46,879.54 as the "Amount of Secured Claim" applicable to the property. In his Schedule D for that case, he attributed the full amount of that debt to the claim of Margie Soost. On the accompanying Schedule C, he claimed an exemption in a stated value of $1.00 for his interest In the property. No one objected to that claim of exemption. When the Debtor submitted his lien avoidance motion in that case, he stated in an affidavit that the balance on the debt secured by the mortgage against the property was $46,879.54 as of May 18, 2000. He cited an amortization table prepared by a CPA as his support for this statement.

In his current Schedule A, the Debtor recites a current market value for the property of $26,000.00, and an "Amount of Secured Claim" of $59,000.00. In his Schedule D, he recites $15,115.00 as the amount of Margie Soost's secured claim against the property, and $12,904.55 as the amount of NAH's secured claim. These are the only secured claims itemized on Schedule D; there is no explanation why they do not total to the $59,000.00 noted on Schedule A. The Debtor has not claimed an exemption for his interest in the property, for the present case.

These volt-faces in position are significant for the good faith inquiry in two different ways.

First, they evidence one thing quite clearly: regardless of what he has said before, the Debtor has been willing to make any fact averment necessary to serve the strategy he adopts for the context of a given legal proceeding.

The statements the Debtor gave in post-judgment disclosure might be a baseline of his first beliefs—made, as it appears, without benefit of counsel and thus more likely to have been spontaneous and unrehearsed. In the context of the Chapter 7 case, however, his mother's secured claim bloomed to more than three times the amount he had averred for the state court only thirteen months earlier. He used this as a platform for his claim that the property was completely encumbered by his mother's lien, with no value to which NAH's judgment lien could attach. This made it seem that NAH would not lose anything of real economic value, were his motion granted and the property fully freed of the lien.

It is unknown from this record whether the Debtor justified his change in position to Judge O'Brien. Where and as advanced, however, the statement dovetailed

with the Debtor's invocation of the lien avoidance remedy: he postulated a nominal value of $1.00 for his interest ("equity") in the property; he claimed and was allowed an exemption in that amount under the "pourover" provisions of 11 U.S.C. § 522(d)(5); and he then argued that this justified a full divestment of NAH's judgment lien.[2]

This plan, simplistic and numerically driven, had its downfall when the B.A.P. applied some legal refinement; the Debtor's remedy under § 522(f)(1) lay as to the exempted value of his interest, not as to the asset itself. *See* 262 B.R. at 72. Thus, the attachment of NAH's lien survived the Debtor's gambit under Chapter 7, though he clearly had intended to extinguish its statutory security.

Coming back around into bankruptcy for the present case, the Debtor came back around on the issue of valuations. The conclusion is inescapable: he changed his theory of fact on this issue because he had no chance of getting a plan confirmed under Chapter 13 unless he did. Now, he professed to be willing to pay over time to effect a release of the judgment lien-a change of heart that came only after his defeat in the first case. However, only by substantially reducing the treated amount of his mother's secured claim could he propose a numerically-defensible payment plan. Had he built the prior stated amount into the structure of his plan, there would have been the potential for large issues, fatal to confirmability.[3] Thus, he shrunk the stated value of his mother's secured claim back down, by two-thirds of the amount recited for the Chapter 7 case. This made a paper platform to free asset value for reattribution to NAH's secured claim; it also reduced the amount of payment necessary to service his mother's claim.

This whipsawing of factual theories raises a strong effluvium of artifice. Behind it, there is the large mystery about the rationale: the Debtor never explains the several values assigned to his mother's claims, let alone the reasons for changing them several times.[4] There is also the

---

2. There was a further strategic interlock: the attribution of minuscule value to the interest in real estate enabled the Debtor to invoke § 522(d)(5) to exempt separate personal property assets that otherwise were not covered by the specific provisions of 11 U.S.C. § 522(d).

3. To obtain confirmation, the Debtor had to satisfy § 1325(b)(5) as to NAH's claim. It was a safe bet that NAH would not accept any treatment short of full payment in a cash lump sum or a surrender of the real estate; thus, the alternatives of §§ 1325(b)(5)(A) and 1325(b)(5)(C) were out. The Debtor, then, had to provide for NAH retaining its lien and receiving a distribution of a

> . . .value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim [that was] not less than the allowed amount of such claim. . .

11 U.S.C. § 1325(a)(5)(B). Arguably, *res judicata* would have applied on the issue of the avoid ability of NAH's judgment lien. This would have left NAH the holder of a fully-

secured claim, entitled under this statute to the full value of its judgment. The Debtor clearly lacked the disposable Income to pay off nearly $70,000.00 in secured claims over just five years.

4. The mortgage deed to his father terms the debt payable "On Demand" and provides for accrual of interest at the rate of nine percent per year. The Debtor offered no evidence to link this interest obligation to the several ways he calculated the aggregate amount owing to his mother. In testimony, he admitted he had been "spotty" in making payments on the note. Finally, he acknowledged that he had made somewhere between five and ten single payments in total since 1986, most recently in the amounts of $500.00 and $750.00 in 2001 and 2002. He was unclear as to how those few payments had been applied, between principal and interest. The amount recited for the claim in his Schedule D in this case is the face amount of the note itself. Obviously. this number would not take into

matter of his mother's silence. It is of no moment that she has never come forward to object to any particular value assigned or treatment proposed for his claim. If anything, that suggests that she is willing to allow the Debtor to manipulate the appearance of her senior encumbrance.

This positioning and repositioning on the encumbered status of the real estate is the act of someone who says what he has to, at the moment, but is ready to tacitly disavow the position if it proves inutile and something else might be tried. When presented with his successive contradictions, the Debtor responded that his previous attorney "could explain that better than" he. He tried to pass himself off as someone who just followed the advice of counsel without thought or question.

When it comes to the consequences of material entries on bankruptcy statements and schedules that are false or contradictory, the rationale of "just relying on counsel" is no excuse. Debtors have a personal, direct duty of truthfulness and candor with the court. The extension of this is that they have an obligation to correct counsel's obvious errors in preparation, or counsel's misstatements.

In any event, the characterization of the Debtor as the dupe of his prior counsel is belied by the balance of his performance on the witness stand. He clearly is a person of some intelligence, familiar enough with the basic way in which money works from his several decades of experience as the sole proprietor of a construction business. In the ordinary run, that experience would have made the Debtor savvy enough to understand his obligation to the Bankruptcy Court to state the truth on the characteristics of his debt and asset structures, as he knew it and for once and for all. There is no way he could have been telling different and far-ranging varieties of the truth at all of the times noted.

In sum, the plasticity of the Debtor's avowals of fact, culminating in the ones underlying this plan, is a strong mark of his lack of good faith toward the administration of the bankruptcy laws. He simply is not here with the right respect for the integrity of a court's process.

### b. The lack of completeness in the Debtor's submissions in this case.

On his Schedule I for this case, the Debtor identified his occupation as "Self Employed Carpenter." He gave $1,456.80 as the amount of his income per month. This was the only income he identified. He placed it in the blank for "Regular Income from Operation of Business." Nowhere in Schedules I or J did he itemize for payment on income or medicare taxes or social security, whether on a withholding or escrow basis. He also left the entries in Schedule I's column for "Spouse" blank, though he identified a spouse by name. Measured against the monthly household expenses of $1,122.69 that he itemized on Schedule J, the Debtor

---

consideration either interest accrual or payments actually made. Conflicting with that are the larger and much larger amounts recited in his current Schedule A and variously in the Chapter 7 case, which all seem to incorporate a substantial interest accrual. This would be more in line with his negligible performance in payment, but there is no detail as to how he calculated the amounts. (Further confusing the issue, the Debtor stated with some annoyance that his own CPA-generated amortization did not credit him for several payments he had made before the time it was prepared.) Finally, in the fallback to a much smaller claim for his case, there is no indication as to why it is larger than the face amount of the note, but only by a modest amount. This suggests some attributed accrual of interest, but the increment is nowhere close to what a nearly-uninterrupted mounting at nine percent would produce over sixteen years, compounded or not.

showed $334.11 per month in "Excess Income." He proposed to commit this amount to his plan.

In testimony, however, the Debtor stated that he had been married since late April, 2002; that his wife was employed at Schweigert Foods, making between $1,100.00 and $1,300.00 net per month; that his wife's income was "more than enough to cover" their household expenses; and that, "if it need be," he would ask the Court to consider his wife's income in evaluating his ability to make payments.

Equally troubling was the evidence that the Debtor himself produced to bolster his case on income generation. One David Dickie, a business entrepreneur with numerous interests in and around Dodge Center, Minnesota, testified that the Debtor had worked for him for several years on building construction, renovation, and rehabilitation. Dickie stated he had compensated the Debtor on an hourly basis during the full term of their engagement; that he was currently setting a base "salary" for the Debtor at $243.00 per week, based upon a rate of $16.00 per hour; and that his bookkeeper took withholding from the amounts paid to the Debtor, at least for social security and medicare tax. He acknowledged that he did not have an exclusive call on the Debtor's services. The tenor of Dickie's testimony was that the Debtor did not work a full forty hours per week for him, and that he had no objection to him doing construction work for customers "on his own time." He did state that he would employ the Debtor on a full-time

basis for construction and property management, if the Debtor wished.

This revelation of an employer-employee status flew in the face of both the Debtor's bankruptcy schedules, and statements given under oath before this case was commenced.[5] In his testimony, the Debtor acknowledged that Dickie withheld medicare taxes and social security from his disbursements to him, but that he "consider[ed] [him]self to be a business" because of the other work he did for third-party customers. He cited the distance between his home and the situs of most of Dickie's projects as the reason why he did not work for him full-time. He did not testify in any detail as to how his personal revenues broke down between wages from Dickie and the receipts from his other work. Nor did he expand on any of the questions raised about whether he actually received more income than recited in his Schedule I.

 Most of these discrepancies are still unexplained after the close of evidence. In the aggregate, they are not the mark of a person using Chapter 13 in good faith. Full and accurate disclosure on bankruptcy schedules is incumbent on any debtor. 11 U.S.C. § 521(1); *Mertz v. Rott*, 955 F.2d 596, 598 (8th Cir.1992); *In re Sears*, 246 B.R. 341, 347 (8th Cir. BAP 2000) (both applying 11 U.S.C. § 727(a)(4)(A)). As applied to Schedules I and J in a Chapter 13 case, it is imperative because creditors and the standing trustee should not have to conduct an independent discovery process to initially gauge whether the debtor will comply with the "best

---

**5.** Those included an affidavit that Dickie had given, apparently at the Debtor's behest, in which he attested to a contractor-customer relationship, and the UCF–22 disclosure form that the Debtor gave to NAH. As to the latter, the Debtor stated in cross-examination that he had not even included his wages from Dickie,

only "what [he] would charge other people." At the evidentiary hearing, NAH's counsel was visibly nonplussed by this newly-emergent version of the story, on an issue that had been bruited about in litigation for several years.

efforts" test of 11 U.S.C. § 1325(b)(1)(B)[6], or the feasibility requirement of 11 U.S.C. § 1325(a)(6).[7] Here, the Debtor omitted very nearly half of his household income when the form clearly called for disclosure of spousal earnings. He failed to disclose a status as a part-time employee subject to withholding. By not doing so, he created the impression that all of his personal income was derived from the business of contracting with third parties, and hence was more limited, less certain, and less steady. He has not accounted for payment of income taxes and social security in either of his cases. He included no detail on the method by which his ostensible gross business revenues were calculated. Little of his earlier disclosure on paper reflected reality, at least as described by the testimony.

The Debtor did nothing to promote an easy evaluation of his status. In fact, he so confused the issues that a full evidentiary hearing still leaves many aspects of it unclear. Dropping the availability of his wife's income into the mix, but only when queried during his testimony, raised another tangle: if the amount of her income was equal to or greater than the amount of expenses he recited, should he not be attributed with substantially more disposable income, and hence paying far more into the plan? Neither side explored this new permutation, but raising it only underscored the inevitable conclusion. The low quality of the Debtor's disclosures of employment status and income over two different bankruptcy cases—slipshod to the point of being untruthful—is another badge of bad faith.

### c. *Trying to have it both ways: the cumulation of contested filings.*

In a more abstruse way, the whole history between these parties demonstrates the Debtor's lack of good faith in proceeding with this case.

First, let us coin a term for the phenomenon at bar: "the cumulated bankruptcy filing."[8] At least at this point, the term "cumulated bankruptcy filing" is best reserved for the following situation: a debtor files initially under Chapter 7, seeking what might be called the "cut and run" form of bankruptcy relief-the benefit of the quick and very broad discharge of debt and, perhaps remedies ancillary to it, with little cost or legal consequence. His easy attainment of that goal, however, is frustrated by an aggressive creditor that intervenes in the Chapter 7 case to vindicate its rights in some fashion, actively litigates

6. This statute requires that, upon objection by a party in interest, if the debtor does not propose to make full payment on all claims, ...the plan [must] provide[] that all of the debtor's projected disposable income to be received in the three-year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.
Section 1325(b)(2) then defines "disposable income."

7. This statute requires the debtor to show that he or she "will be able to make all payments under the plan and to comply with the plan."

8. "Serial filing," the term often attached with pejorative connotation to a pattern of successive petitions by one debtor, does not quite fit here. That term usually signifies a series of cases in which a debtor was patently seeking to interpose the automatic stay of 11 U.S.C. § 362(a) against a secured creditor's enforcement procedures, by filing intermittent and successive petitions under a single chapter of the Bankruptcy Code but without a bona fide intent to follow through on the attendant Code-imposed duties. *E.g., In re Pike*, 258 B.R. 876, 881 (Bankr.S.D.Ohio 2001); *In re McKissie*, 103 B.R. 189, 191–192 (Bankr. N.D.Ill.1989). The adjective "serial" implies something more than two events in succession, as occurred here. In addition, it cannot be said that this debtor did not use the bankruptcy forum and take up its remedies; he did both, in an active if misdirected fashion.

against the debtor, and wins. Only at that point does the debtor decide he would be better off under one of the rehabilitative chapters of the Code, and only then does the debtor mouth a willingness to assume the greater administrative and financial burdens that they impose on debtors. The debtor's filing under one of those chapters cumulates on the Chapter 7 filing that did not produce the debtor's original goal, of a rapid and uncontested shirking of the burdens of debt.

When the Debtor here elected to file for bankruptcy under Chapter 7, he chose to try to cut and run as to NAH and its claim. The potential "downside" to the choice was two-fold. The first—exposure to loss of assets through liquidation—had little portent for the Debtor.[9] The other negative was the relative lack of debtor's remedies against lienholders under Chapter 7. The only significant exception to this rule is the lien avoidance remedy under § 522(f)(1), which is limited by the language of the statute to specific types of liens and classes of assets.[10]

For his Chapter 7 case, the Debtor was represented by an attorney who for years has filed significant numbers of bankruptcy petitions on behalf of debtors from southern Minnesota. The Debtor had the choice between the two complexes of bankruptcy relief for individuals of modest means, that under Chapter 7 and that under Chapter 13. Presumably with the advice of that counsel, he made his choice. In hindsight, the Debtor's strategy is utterly transparent: he was going to get relieved of personal liability for NAH's claim via discharge, and to get his real estate relieved of NAH's lien via avoidance. Then, he would walk away from a creditor that would receive nothing. In his first case he had no thought of paying NAH, let alone any of his other creditors.

So far as this strategy went to NAH's claim, the B.A.P.'s opinion proved it ill-

---

9. In general, the prospect of such loss is meliorated through the process of exemption under 11 U.S.C. § 522(b). In practice, liquidation in bankruptcy has no financial impact at all on most Minnesota debtors due to the flexible and relatively generous exemption rules here—large values fixed by Minn.Stat. §§ 510.01 *et seq* and 550.37, and the availability of the federal exemption table of 11 U.S.C. § 522(d).

10. This circumstance reflects the longstanding tenet of American law that discharge in bankruptcy does not affect creditors' *in rem* rights to their security. *E.g., Dewsnup v. Timm*, 502 U.S. 410, 418, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992); *Long v. Bullard*, 117 U.S. 617, 620–621, 6 S.Ct. 917, 29 L.Ed. 1004 (1886). The Code's complexes of rehabilitative remedies-those under Chapters 11, 12, and 13–give debtors more remedies against the strict enforcement of liens under nonbankruptcy law. They do so at a price, and in several varieties. A debtor using the rehabilitative chapters must propose a plan that entails some sort of continuing obligation to make payment on account of debt, both secured and unsecured. A debtor under Chapter 13 does not cut and run with a promptly-granted discharge; he remains under a trustee's oversight and subject to the court's jurisdiction for a substantial length of time before he is entitled to a discharge. He is subject to § 1325(b)'s obligation to apply all disposable income to creditors' claims. And, he must give substantial deference to his creditors' original expectations of payment within the structured requirements of §§ 1322 and 1325. With the assumption of those burdens, a debtor can reconfigure the contractual rights and expectations of his secured creditors in varying degrees. He does so under the empowerments of §§ 1322(b)(2) (to "modify the rights of holders of secured claims," other than the holders of homestead mortgages), 1322(b)(3) (to "provide for the curing and waiving of...any default"), 1322(b)(5) (to "provide for the curing of any default within a reasonable time" on long-term secured obligations), and 1322(c) (permitting the cure of default and deceleration of the obligation on debts secured by homestead mortgages, as long as no foreclosure sale has occurred).

founded. Getting to that point involved months of delay; it required NAH to incur substantial attorney fees in the Bankruptcy Court and on appeal. All of this was the Debtor's doing, caused by his performance on a self-interested strategy.

Simply stated, in this cumulated bankruptcy filing the good faith element of § 1325(a)(3) should lie so as to hold the Debtor to the consequences of that first election. When he now says he is willing to pay NAH in a ratable fashion, he simply is not credible. Until now, he doggedly sought a result that would have been destructive to NAH's rights. The contest over that goal was very burdensome to his opponent. The Debtor sought a result that was inconsistent with the Code's principles, as measured by the B.A.P.'s analysis. After he undertook the risk inherent in such litigation, at such burden to his opponent, he must be bound to its consequences: NAH's lien is attached, and its holder must be allowed to enforce it as it sees fit. It would neither be fair nor congruent with the pro-rehabilitation principles of Chapter 13, to allow the Debtor to try to undo the consequences of an ill-starred crusade.

With an analytic framework posed this way, two questions require specific answers.

First, did this debtor act with a lack of good faith in commencing this case as a cumulated filing and in presenting this plan? The answer has to be "yes." The Debtor had Chapter 13 available to him in 2000, but he chose not to use it because he thought he saw an even better out.[11] There is no apparent reason why the Debtor could not have filed for Chapter 13 in the first place and proposed a like treatment for NAH's claim there. That strategy would have saved both sides the considerable expense of litigating up to the B.A.P., and the delay of two-plus years in finalizing the parties' status on the enforcement of NAH's judgment lien.

The Debtor is appropriately tagged with the mark of a lack of good faith for not having done so in the first case, and for coming back to the Court in as unconvincing a fashion now. Standing alone, the circumstances of this cumulated filing defeat the Debtor's case under § 1325(a)(3).

■■■ The second question is whether all plans presented on cumulated filings are to be deemed to lack good faith under § 1325(a)(3). The Eighth Circuit mandates that the good faith issue be "evaluated on a case-by-case basis in light of the structure and general purpose of Chapter 13." *In re LeMaire,* 898 F.2d at 1353 (internal quote omitted); *In re Estus,* 695 F.2d at 316. Given that, a per se rule would be inappropriate. Nonetheless, given the way in which debtors' filing strategies have evolved since *Estus,* it is appropriate to impose some controls by using the concepts.[12] The pat argument of many

---

**11.** Nothing suggests that the Debtor's income and expenses were different as of the date of his first bankruptcy filing. This means that, as measured by the face of Schedules I and J, he would have had comparable disposable income to fund a plan very similar to the one at bar. In such a case, he probably would have had to propose a zero-distribution treatment for the holders of unsecured claims, just as he did in this case. There probably is no impediment to confirmation for such a treatment, if a debtor meets the "best efforts" test of § 1325(b). *See Education Assistance Corp.*

*v. Zellner,* 827 F.2d at 1227 (concluding that 1984 enactment of § 1325(b) and its "ability to pay" criteria subsumed the financially-based factors in *Estus's* list). (*Zellner* probably vitiates the holding in *In re Terry,* 630 F.2d 634 (8th Cir.1980)).

**12.** The courts can properly take a role in lessening the abuse of society's institutions for dispute resolution, and should try to ensure that public and private resources are not wasted in those institutions' processes.

debtors' counsel, that nothing in the text of Chapter 13 prohibits the practice of cumulated filing, should not suffice any longer.

At this point, the concept of cumulated filing could be used best as a means of allocating burdens. If a creditor is pulled into a cumulated filing in Chapter 13 after lengthy involvement with the same debtor in a prior Chapter 7 case, and was significantly burdened in getting to its victory there, it can object to confirmation under § 1325(a)(3). It would cite the circumstances that would characterize the current filing as cumulative, identify its prejudice, and oppose the debtor's proposal to alter its hard-vindicated rights. This would satisfy the creditor's procedural burden of coming forward.

The debtor then would bear a heightened burden of production, to more exhaustively demonstrate that he is acting in good faith in proposing his plan. Proof toward such a responsive burden could go to many aspects of the parties' history. The merits of the prior bankruptcy litigation would be relevant, in the sense of whether the debtor had had a reasonable basis for proceeding under Chapter 7. Cutting against a debtor on this point would be strong evidence on factual points adverse to the debtor, binding precedent, or strong persuasive authority that should have discouraged the debtor's pursuit of Chapter 7 remedies. Other relevant points would be the creditor's past conduct toward the debtor, the reasonableness of its pre-bankruptcy demands and actions, the degree of zeal in pursuing its case in the bankruptcy court, and so forth. The debtor would have the onus to defend his return to the bankruptcy court's jurisdiction and his use of the Code's alternate remedies, when they had been there in the first place and the debtor had chosen not to use them. In a broader sense, this concept is a means to lessen the rechurning of disputes already litigated to substantive outcome in the forum of bankruptcy.

### d. Self-enrichment at the expense of unsecured creditors.

■ Though NAH did not address this in a pointed fashion, the structure of the Debtor's plan evokes another form of bad faith, the one previously identified In re Cordes, 147 B.R. 498 (Bankr.D.Minn.1992).

Clearly, the Debtor's goal is to pay down the debts that encumber the Waseca County real estate and to free the property from the two liens within five years. This is not the Debtor's homestead, however. He and his wife live in a large old house on other real estate owned by his mother. They occupy it on loose, open-ended terms that require him to maintain and modestly improve it.

The Waseca County real estate consists of ten acres. Half of it is presently returning to forest, from a past use as tilled crop land. Apparently it has been in the Debtor's family for some time; the Debtor claims to have had it "in [his] possession" since age six. In 1978, the Debtor constructed a polygonal structure of vernacular design, and moved it to the real estate.[13] The building has a wood- and metal-working shop and space for storage on its first floor, and an office in a smaller upper level. The Debtor actively uses the shop to plane wood stock into specialty trim and to assemble cabinetry for his construction jobs. He uses the building to store the bulk of the tools he uses for work.

The improvements are not suitable for residential use, however, and the Debtor has never lived on-site. Nor does he make use of the acreage away from the shop

---

13. Using current Minnesota parlance, the Debtor admitted of the layout, "it's different."

building and its immediate surroundings; he has not hunted for nearly fifteen years, would not use the premises for such sport, and is content to allow it to go back to brush and trees. On cross-examination, the Debtor admitted that the shop building could be moved off-site, and that he could place it on his mother's real estate without decreasing its usefulness.

The Debtor's possession of the Waseca County real estate is not quite the surplusage and indulgence presented in *Cordes.* Nonetheless, the property is neither necessary to the Debtor's maintenance of everyday life, nor essential to the conduct of his trade. Were he deprived of both land and building, he could still maintain a safe roof over his head, and pursue his livelihood. His tools and equipment are not subject to the lien of either mortgage and could be taken elsewhere. NAH's counsel even suggested that, were his client to foreclose its mortgage, the Debtor could remove his shop building to another place. The record suggests that this could be done without significant damage to the structure. This would result in even less disruption to the Debtor's business than leaving the building behind and removing the personalty.

It may sound cavalier to dismiss the Debtor's long-term sentimental and familial ties to the land. Nonetheless, it is clear that he could lose this asset, either real estate alone or real estate and improvements, and still would have a perfectly sound and stable life. Measured by its lack of necessity to that end, this property is a "luxury"—despite the fact that the Debtor does not use it for recreational purposes. Under the Debtor's plan, he would build up a full equity in this nonessential asset over five years, and would not pay a dime to his unsecured creditors. Under *Cordes,* this plan treatment fails the good-faith requirement. 147 B.R. at 505.

## B. Feasibility.

NAH's other objection goes to the Debtor's case on 11 U.S.C. § 1325(a)(6), the so-called "feasibility requirement." The statute requires a debtor to demonstrate that he or she "will be able to make all payments under the plan and to comply with the plan." In the case of a plan funded by a debtor's future income, as nearly all of them are, this is a straightforward factual inquiry: is it more likely than not that the debtor will generate enough disposable income over the term of the plan to meet his payment obligations? *In re Wagner,* 259 B.R. 694, 700 (8th Cir. BAP 2001). *See also In re Clarkson,* 767 F.2d 417, 420 (8th Cir.1985) (applying feasibility requirement of 11 U.S.C. § 1129(a)(11); noting that the issue is "whether the things which are to be done after confirmation can be done as a practical matter under the facts"). Where part of the funding for creditor payments would come from a source other than ongoing wages or business revenues, the issue is still one of practical mechanics: will the contemplated sale of assets be closed, or will the third party produce the funds, in a timely fashion, to bring about the cash infusion to the Chapter 13 estate at the time when the plan contemplates? *In re Wagner,* 259 B.R. at 700–701; In *re Newton,* 161 B.R. 207, 217–218 (Bankr.D.Minn. 1993).

The Debtor's plan contemplates three flows of funds over the 60 months of the plan, for payment to the two secured creditors. First, the Debtor would make payments of $334.11 per month to the Trustee, from his current income. Second, the Debtor specifies annual payments of $1,000.00 each to NAH and his mother, to be made on the anniversary date of the first payment to the Trustee. These, apparently, would be made directly by the Debtor to these cred-

itors, from other current income.[14] Finally, the Debtor would make balloon payments of the balance of the two secured claims, in the amount of $2,419.30 to NAH and $6,649.30 to Margie Soost. These would come due in month 60 of the plan, and be made from the sale of "a portion of real property at end of plan . . . , if necessary."

The Debtor's evidence on this issue was an odd assortment of points that did not cumulate to anything meaningful. The Debtor can count on a minimum of $243.00 per week in wages from David Dickie. Apparently, this figure is gross income, without reduction for taxes or other payroll withholding. It is reasonably clear that Dickie will have work at this level for the Debtor for three to five years. This would match to the duration of the plan. There is no basis to find any greater potential for wages or other income from Dickie.[15]

For his own part, the Debtor testified that currently he was "pretty much working for" Dickie, for anywhere between 10 and 70 hours per week, though he took "outside jobs" on a bidding basis. He described "possibilities" for two such contracts, as well as his hope to develop a business to produce custom-designed wrought-iron furniture. He stated that he performs some task for Dickie virtually every day, but is able to schedule such duty around the requirements of other third-party contracts he may have. He noted in broad fashion that the statements of monthly income in the schedules for his bankruptcy cases have been calculated by counsel from income-tax returns, but he neither attested to the aggregate annual figures for income stated on those returns nor produced them as exhibits.

And that, literally, was all the Debtor offered on feasibility. He did not produce a paycheck stub, W–2 form, or Form 1099 from Dickie for documentary proof of his earnings for *any* interval. He did not produce income-tax returns for any recent year, from which a monthly average could have been gleaned. There is nothing on which to make any finding as to the Debtor's anticipated performance under a plan, other than the recitations on the face of his Schedules I and J and the broadly-phrased testimony of himself and his witness. The schedules, of course, are seriously inconsistent with other statements on the same issues, in other material respects. One can see Dickie's proffer as a fall-back for the Debtor to ensure adequate income, but the Debtor did not exactly communicate an eagerness to use it.

None of this preponderates; it simply does not enable fact-finding of sufficient

**14.** The plan is not clear on this point, but simple arithmetic shows that the stated total of payments to be made to the Trustee could not possibly service five years of payments to the two secured creditors at an additional $2,000.00 per year, given everything else that the Trustee would service.

**15.** Dickie partially underwrites the cost of the Debtor's commute by letting him buy gasoline on his business account. They have discussed giving the Debtor some sort of cash allowance for transportation, but to no conclusive terms. Dickie has paid bonuses to the Debtor occasionally, as he does with all employees he deems "good workers" and he indicated it was "possible" he would give one to the Debtor in the near future. These sources clearly will not make a significant input to the Debtor's means. Dickie readily attested to his desire to employ the Debtor full-time, and to having enough work and new duties for him to merit it. He could not state the income potential from this enhancement with any greater precision than "probably in the $18.00–$20.00 per hour range, eventually." That vagueness was understandable, because the Debtor evinced no great willingness to work full-time for Dickie—ostensibly because of the 60–mile–one–way daily commute it would entail.

precision on the first aspect of NAH's feasibility objection. *A fortiori,* the conclusion applies to the proposal to make stepped-up annual payments as well: if the Debtor had not proven up a sufficiency of income on a regular monthly basis, how could one conceive of him accumulating even more funding for annual lump-sums?

Finally, there is no showing at all on the Debtor's ability to fund a closing paydown and satisfaction of both liens. He brought in no evidence on his ability to finance the balloon payments through a third party.[16] His evidence on ongoing income does not show he will be able to save it up. Nor did he show that he could generate the moneys by severing part of the Waseca County property and selling it. In these times, one cannot count on any division or subdivision of land passing muster under zoning law or ordinance, the stringency of which is increasing in rural areas. It was incumbent on the Debtor to show he would have the legal ability to divide the property for sale. His proffer on this point was not admissible. He had nothing else. Vague, terse, and uncertain proposals for funding creditors' treatments under Chapter 13 by asset sales do not pass muster under §§ 1322(b)(2) and 1322(b)(5), and hence do not meet § 1325(a)(1). *In re Newton,* 161 B.R. at 218.

The Debtor, therefore, has not met the feasibility requirement of § 1325(b)(6) for his Fifth Modified Plan.

### C. Conclusion.

The plan at bar cannot be confirmed. Given the finding on the Debtor's lack of good faith in filing, no plan can be confirmed in this case.

### II. Motion for dismissal.

Filing a Chapter 13 petition in bad faith is "cause" for dismissal under 11 U.S.C. § 1307(c). *In re Molitor,* 76 F.3d 218, 220–221 (8th Cir.1996); *In re Ladika,* 215 B.R. 720, 725 (8th Cir. BAP 1998); *In re Belden,* 144 B.R. 1010, 1019 n. 14 (Bankr.D.Minn.1992). The Debtor's lack of good faith in filing for relief under Chapter 13 is manifested by all of the same facts that compelled the finding under § 1325(a)(3). *See In re Larson,* 245 B.R. at 616; *In re Mattson,* 241 B.R. 629, 635 (Bankr.D.Minn.1999); *In re Buchanan,* 225 B.R. 672, 673 (Bankr.D.Minn.1998) (all terming difference in good-faith standards under §§ 1307(c) and 1325(a)(3) "nominal"). Too, denial of confirmation of a plan on objection by a party in interest, coupled with the patent inability to propose a confirmable plan, constitutes cause for dismissal of a Chapter 13 case. *In re Barger,* 233 B.R. at 84–85 (applying coordinate language of 11 U.S.C. § 1208(c)). Such is the case here.

### ORDER

Upon the decision just memorialized,

IT IS HEREBY ORDERED:

1. Confirmation of the Debtor's Fifth Modified Plan, as filed on November 7, 2002, is denied.

2. This case is dismissed.

---

**16.** Dickie would have been a likely source of help, but he testified that the Debtor had never talked to him about the issue.