**In re Thelma Fay KURTZAHN, Debtor.**

No. 05–90815.

United States Bankruptcy Court, D. Minnesota.

Jan. 31, 2006.

**358**

Sam Calvert, St Cloud, MN, for Debtor.

ORDER DENYING DEBTOR'S MO-
TION FOR CONTINUATION OF
STAY PURSUANT TO 11 U.S.C.
§ 362(c)(3)(B)

GREGORY F. KISHEL, Chief Judge.

This Chapter 13 case was commenced after the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. No. 109–8 ("the Act"). It came on before the court on December 20, 2005, for hearing on the Debtor's motion under 11 U.S.C. § 362(c)(3)(B)—one of the provisions that the Act added to the Bankruptcy Code. Samuel V. Calvert appeared for the Debtor, who also appeared personally; Erik F. Hansen appeared for Anderson Homes, Inc., a scheduled creditor. The following order memorializes the disposition of the motion.

## THE DEBTOR'S GENERAL HISTORY IN BANKRUPTCY; THE POSTURE OF THIS CASE.

The Debtor is a 72–year–old woman. She is married to Vernon Kurtzahn, a 71–year–old man. The Debtor's husband did not join in the petition that commenced the case at bar.

Solely or with her husband, the Debtor has filed for bankruptcy relief four times now. A joint filing under Chapter 7 in 1992 resulted in a grant of discharge.[1] In late 1997, the Debtor and her husband filed jointly under Chapter 13. After obtaining confirmation of a plan, they completed payments and received a discharge on June 1, 2000.[2] In February, 2004, the Debtor and her husband again filed jointly under Chapter 13, commencing case BKY 04–50109. On December 28, 2004, that case was dismissed on motion of the Standing Trustee, for the debtors' default in payment under their confirmed plan.

Then, on November 23, 2005, the Debtor filed the petition under Chapter 13 that commenced this case. On December 2, 2005, the Debtor's counsel served and filed the motion at bar, styling it under 11 U.S.C. § 362(c)(3)(B).[3] Through it, the

---

1. The file number of this case was BKY 92–33046. A quick search of the court's electronic record revealed this case in the archive database. Neither counsel mentioned this first filing in their presentations for this motion.

2. The file number of this case was BKY 97–47863. The Debtor's counsel cited the experience with the case as proof of his client's ability to follow through on a program of debt adjustment. Counsel for Anderson Homes cited it as the first court-related evidence of a persisting major financial imbalance in the Debtor's household.

3. With commendable foresight, the Debtor's counsel served all of his client's scheduled creditors with his motion documents, and set the hearing 18 days out from the date of the

Debtor seeks "an order continuing the automatic stay in [this] case past the initial thirty (30) day grace period after the filing of the Debtor's petition . . ."

## FACTS

### 1. The Debtor's Relationship with Anderson Homes.

The Debtor, her husband, and their 24–year-old disabled granddaughter live in a 1995–model Friendship 16' × 76' manufactured home that is located on a rented lot in a mobile home park in Rice, Minnesota. The Debtor's daughter originally purchased the mobile home in 1994, taking title in her own right. The daughter did not have the money for a down-payment, so the Debtor advanced $10,000.00 of her own funds to enable the purchase. These monies came from the proceeds of a settlement of a worker's compensation claim. Apparently the Debtor, her husband, the daughter, and the granddaughter all lived in the mobile home until the spring of 1997. At that time, the Debtor's daughter left the living arrangement; the understanding was that the mobile home was now to be her parents', to keep or to abandon as they saw fit.

Apparently Anderson Homes consented to roll the financing arrangements over to the Debtor and her husband. The Kurtzahns, as "Buyers," executed a Motor Vehicle and Mobile Home Retail Installment Contract on April 30, 1997. Under it, they undertook the debt and took title subject to a security interest in favor of Anderson Homes.[4]

Almost immediately, the Debtor and her husband defaulted in payment under the financing. A claim and delivery action by Anderson Homes in the Wadena County, Minnesota District Court was cut short by the Kurtzahns' 1997 Chapter 13 filing. Apparently the Kurtzahns' performance under that case's plan left Anderson Homes in a posture acceptable to the creditor at the end of the case; the Kurtzahns received a discharge and had retained possession of the mobile home through to the grant of discharge.

By the early fall of 2003, the Kurtzahns were again in default to Anderson Homes. On October 4, 2003, counsel for Anderson Homes commenced another claim and delivery action against the Kurtzahns in the Wadena County District Court. At that point, the Debtors had not made payment to Anderson Homes since April 17, 2001. Prosecution of a claim and delivery action was stayed by the Kurtzahns' second filing under Chapter 13. In their plan in that case, they proposed to cure an $8,800.00–plus default on the mobile home financing by the secured party receiving $161.00 per month from the trustee, over a 60–month period. The court confirmed that plan on May 25, 2004. The Kurtzahns made the first four months' payments to the trustee. This resulted in four disbursements of cure payments on the mobile home financing and a $140.00 partial disbursement on the claim of their attorney for his fees.[5]

---

mail-format service. By doing so, he avoided the notice-oriented pitfalls of § 362(c)(3)(B) that were treated in *In re Collins*, 334 B.R. 655 (Bankr.D.Minn.2005) and *In re Taylor*, 334 B.R. 660 (Bankr.D.Minn.2005).

4. Under the Retail Installment Contract, the Security State Bank of Sebeka, Minnesota, was identified as the assignee of the seller's rights. The document contained an acknowledgment by the Kurtzahns that they knew that

Anderson Homes, as seller, "intend[ed] to assign this agreement to a bank." There must have been a reservation of recourse in the arrangement between Anderson Homes and the Bank; both of them have been involved in the assertion of a secured party's rights during the ongoing history of this credit.

5. Counsel structured the plan to provide for an even amortization of his $1,250.00 in fees over the full term of the plan—a departure

However, the Kurtzahns missed their July, 2004 payment. By the time the trustee moved for dismissal in early December, 2004, they were in default for a total of five months.

After that Chapter 13 case was dismissed on December 28, 2004, Anderson Homes picked up with its pending claim and delivery action. On February 14, 2005, it was granted a default judgment against the Kurtzahns for recovery of the amount in money that was then due under the Retail Installment Contract.[6] After that, Anderson Homes pressed on to request an order granting an immediate possession of the mobile home in consequence of the adjudication of default on the underlying debt. At a hearing before the state court on its motion for that relief, convened on November 10, 2005, the Debtor appeared and stated that she was trying to find a buyer or to obtain refinancing through a third party. On the Debtor's representations, the state court judge continued the hearing to November 23, 2005.

The Debtor then made several inquiries but failed to find a willing lender. After that, the Debtor consulted bankruptcy counsel, and commenced the case at bar. The continued hearing before the state court was not reconvened.

### 2. Financial Abilities of Debtor's Household, Past and Present.

At all times relevant to this motion, the Kurtzahns have had two sources of income for their household. The steadier one was the social security retirement benefits to which the Debtor and her husband are entitled, plus the Supplemental Security Income ("SSI") benefits received by their disabled granddaughter.[7] The second was wages earned by Vernon Kurtzahn from his employment as a school bus driver with Laidlaw Bus Service.

As to the household's entitlements from the Social Security Administration, the amounts received monthly as of the commencement of this case were as follows:

| | |
|---|---|
| Debtor | $ 296.00 |
| Vernon Kurtzahn | $ 619.46 |
| Granddaughter | $ 111.00 |
| | |
| TOTAL: | $1,026.46 |

In testimony, the Debtor complained of not having had an increase in the amount of her own social security payment for two years. However, she and her husband had recently received notice of such an increase for 2006; the amount of her husband's payment was to go up by approximately $80.00. There also had been some issue during 2005 over the granddaughter's continuing eligibility to receive SSI. That apparently had been resolved via an appeal; the only financial consequence was to have been a one-month offset by the Social Security Administration, to occur in January, 2006, to account for an overpayment that the granddaughter had some-

---

from prevailing local practice, and a definite vote of confidence in his clients following through.

**6.** It is not very clear from the text of the state court's decision just how much Anderson Homes was granted by way of money judgment. That document has a conclusion of law to the effect that the Kurtzahns had "a past due balance" of $8,804.52 and "an outstanding principal balance" of $23,688.50, with this conclusion of law to "constitute the Judgment and Decree" of the state court.

However, it does not specify how all this broke down into the obligation for principal and accrued interest that had been accelerated, which was to be collected via recourse against the collateral. (The state court's decision appears to have been drafted by counsel for Anderson Homes.)

**7.** Though SSI is fundamentally a welfare program rather than social insurance, it is administered by the Social Security Administration.

how received during the process of appeal.[8]

With the increases in the elder Kurtzahns' social security retirement income, the amount of their monthly receipts from this source for 2006 will be:

| | |
|---|---|
| Debtor | $ 300.00 (approximately) |
| Vernon Kurtzahn | $ 700.00 (approximately) |
| Granddaughter | $ 111.00 |
| | |
| TOTAL: | $1,111.00 (approximately) |

In addition, the Kurtzahns received some sort of additional monthly payment, in the amount of $300.00, "for care of dependent," presumably the granddaughter. There was no testimony on this income source—its existence is gleaned only from the Debtor's Schedule I—but there also is no reason to doubt that they do receive it, whatever its source.

At all relevant times, Vernon Kurtzahn has driven for Laidlaw Bus Service on a steady basis, transporting students in the Sauk Rapids–Rice School District during the nine-month school season.[9] He receives an average of $1,300.00 per month in net wages for this duty during that part of the year. He has taken work during the summer months driving bus for summer-school students, on a reduced-hour schedule that has netted him an average of $600.00 to $800.00 per month during a normal summer. The record suggests that he is able to do this for two and perhaps three full months of the summer.

Neither 2004 nor 2005 were normal years for Vernon Kurtzahn, however. In 2004, he was not given an assignment for summer school after sometime in July, getting only several small single-trip driving assignments for $40.00 to $50.00 each for the remainder of the summer. In 2005, he had large health difficulties, leading to cardiac surgery (the placement of a stent) in August. This prevented him from working "for a while."

However, the Debtor testified unequivocally and without challenge that her husband will get back to his regular summer-school driving assignment in 2006.[10] The Debtor attributes the default in payment in the 2004 Chapter 13 case to the half-summer's drop in Vernon Kurtzahn's wages that year, as well as extraordinary expenses for vehicle and mobile home maintenance that had to be done to preserve the residence and the household's transportation.[11] The Debtor does not expect these expenses to recur in the near future, but she hopes that budget edu-

---

**8.** The Debtor's testimony on this point was vague, and somewhat roundabout in its development. However, she did state unequivocally and without contest that her granddaughter was still eligible for SSI and would be receiving a monthly check for February, 2006 going forward.

**9.** The Debtor's Schedule I recites that he has held this employment for eighteen years.

**10.** The Debtor also testified in a vague way to how she expected the higher-income portion of her husband's work year to lengthen in 2006, because "they're going to increase school time further in the summer." This testimony was neither credible nor probative, and it lacked foundation. The Debtor's surmise may have had its origin in recent media coverage of proposals to extend the public school year generally across Minnesota as a means to better prepare graduates for a globally-competitive workplace. To date, the floating of broad proposals is all the further this initiative has gotten. In today's political climate, the issue of current funding alone makes the Debtor's remarks unfounded speculation—particularly where a single rural school district in central Minnesota would be the one to make the extension.

**11.** The Debtor's counsel did not elicit very much detail from his client on these expenses. It appears that the Kurtzahns' aging vehicle required substantial engine and transmission repairs, and that the leaking roof of the mobile home required replacement in whole or in part.

cation will give her and her husband more means to deal with them if they should arise.[12]

There is no evidence of record that Vernon Kurtzahn will not be able to generate the amount of wage income that the Debtor described in her testimony, in the near future at least.[13]

Thus, over the course of performance under the plan that the Debtor has proposed, her household will have an average monthly net income as follows:

| Entitlements Paid by Social Security Administration: | $1,111.00 |
| Support Payment for Granddaughter: | $ 300.00 |
| Average Net Wages: | $1,150.00 [14] |
| | |
| TOTAL: | $2,561.00 |

The Debtor's household expenditures are set forth in her Schedule I.[15] None of these expenditures are unreasonable or unwarranted in amount or nature, given the composition of the household and the configuration of its major asset ownership (living arrangements and vehicles).[16] In total, those expenses amount to $2,233.00.

Thus, on the present record, the disposable income of the Debtor's household amounts to $328.00 per month, on average, on a year-round basis. Under her plan, however, the Debtor proposes to make payments of $415.00 per month to the trustee.

Under Term 8 of her modified plan, the Debtor proposes to have Anderson Homes treated as the holder of a secured claim that would be paid in full over the term of the plan, through disbursements by the trustee from funds that the Debtor paid to the trustee.[17] The Debtor would not have

---

**12.** In cross-examination, the Debtor was questioned as to why she had not tried to obtain a reduction of her payment obligation through a modification of her plan, or otherwise "go back through her attorney" to address her inability to keep current in mid–2004. She responded that she had not known that she could do these things.

**13.** Anderson Homes did not rebut the Debtor's testimony that her husband has recovered from his cardiac surgery, recently passed a required annual physical exam, has no health impediment to driving bus, and is in fact doing so at present under a license that is current.

**14.** This figure is calculated by taking $1,300.00 per month for nine months, and $700.00 per month for three months, and dividing the resulting annual total by 12. Actually applying these fluctuating wage to meet both fixed monthly payment obligations and variable expenses would require some budgeting and forbearance. To the extent that the Debtor has not learned such skills in a lifetime, she would have to master them through a post-petition debtor education course—as is now mandated under 11 U.S.C. § 727(a)(11).

**15.** Both counsel certainly identified the Debtor's *de facto* ability to perform under a plan as the key issue of objective facts for this

motion. However, neither elicited any testimony as to the deduction side of the calculation of household disposable income, when the Debtor was on the stand. Neither counsel objected to the court taking cognizance of the factual content of the recitations in any part of the record for this case or the 2004 case.

**16.** Indeed, there is no line-entry at all for any sort of "contingency expense," i.e., for home or vehicle repair, a large medical expense not covered by insurance, or any other demand that can come up under conditions of emergency in anyone's life.

**17.** In objecting to the present motion, Anderson Homes does not expressly raise the Debtor's proposed treatment of its claim as an indication of lack of good faith. In Term 8 of her modified plan [docket no. 16, filed December 2, 2005], the Debtor recites a "Claim Amount" of $24,000.00 for Anderson Homes, and purports to treat it as partially secured to the extent of $16,860.58. The latter amount, with 8% interest, would be paid beginning in month two of the plan's term, in monthly installments of $346.59 over 59 months, after an initial adequate protection payment of $170.00. The balance of the stated amount of Anderson Homes's claim, approximately $7,100.00, would be relegated to unsecured

an obligation to make a separate payment to Anderson Homes outside the administrative structure of the plan.

### 3. The Debtor's Motive · in Commencing the Present Case.

When the Debtor was testifying, neither counsel asked her why she had gone back into Chapter 13 after the failure of her prior case. In response to the court's inquiry, the Debtor stated that her purpose in filing was to deal with "several debts we couldn't pay," and in particular "to keep from losing my house," because Anderson Homes "was threatening to take it away from us." Earlier, on direct examination, she had said that she was "reasonably sure" that the payments to the trustee "will be made," because she and her husband "will have more financial income coming in 2006." She stated, quite summarily, "I will be able to do better than in the past." The Debtor and her husband had already made inquiry to a local office of Lutheran Social Services, to enroll in a household financial management ·course, and were "trying to get into" it.

### DISCUSSION

This case is the first one in this District to reach the merits of a contested request for relief under the newly-effective 11 U.S.C. § 362(c)(3)(B). The Debtor seeks to obtain a continuing stay of creditors' enforcement of their rights against her and her property, beyond the short 30–day term of the automatic stay of such actions that began when the Debtor commenced this case. She was required to affirmatively request this relief because "a single or joint case of the debtor was pending within the preceding 1–year period but was dismissed . . ." 11 U.S.C. § 362(c)(3). *See In re Collins,* 334 B.R. at 657 (sum-

marizing changes made by the Act to structure of 11 U.S.C. § 362 and operation of the automatic stay in a successor bankruptcy case commenced by a particular debtor).

On such a motion "the court may extend the stay . . . as to any or all creditors . . . only if the [movant for the extension] demonstrates that the filing of the latter case is in good faith as to the creditors to be stayed . . ." 11 U.S.C. § 362(c)(3)(B).

In the first instance, the Debtor had the burden of production on this issue. However, because her predecessor case was characterized by certain acts and circumstances, the adequacy of her proof is governed by 11 U.S.C. § 362(c)(3)(C). That provision creates a presumption that a successor case was "filed not in good faith," which arises in several sorts of instances. Here, the presumption was triggered by two different provisions of the statute, 11 U.S.C. § 362(c)(3)(C)(i)(II)(cc):

> a previous case under any of chapters 7, 11, and 13 in which the individual was a debtor was dismissed within such 1–year period, after the debtor failed to—
>
> . . .
>
> > (cc) perform the terms of a plan confirmed by the court . . .

and § 362(c)(3)(C)(i)(III):

> there has not been a substantial change in the financial or personal affairs of the debtor since the dismissal of the next most previous case under chapter 7, 11, or 13 or any other reason to conclude that the later case will be concluded—
>
> . . .
>
> > (bb) if a case under chapter 11 or 13, with a confirmed plan that will be fully performed . . .

---

status; it would receive pro rata distribution from a residue "pot" that would total only

$412.55, sharing with the holders of another $9,082.23 in unsecured claims.

When the presumption of a "fil[ing] not in good faith" is triggered, "such presumption may be rebutted by clear and convincing evidence to the contrary." 11 U.S.C. § 362(c)(3)(C).

These provisions inject the concept of good faith in filing into the statutory structure of the stay in bankruptcy. In a clumsy and roundabout way, § 362(c)(3)(C) contains the Bankruptcy Code's very first textual essay at defining the concept of good faith, or at least partly outlining it. Lisa A. Napoli, *The Not–So–Automatic Stay: Legislative Changes to the Automatic Stay in a Case Filed by or Against an Individual Debtor,* 79 AM. BANKR. L.J. 749, 768 (2005). The statute does so in a fragmentary and incomplete manner, however, by the use of exemplars of exclusion: if certain extrinsic historical or current circumstances are present, the current case is presumed to have been filed "not in good faith." The Act did not create an express definition of "good faith" *in se;* nor does it furnish any textual guidance for just how to prove good faith in filing, whether in rebuttal of the presumption or to prove it in the first instance in the absence of the presumption. Clearly, the underlying thought is that a lack of good faith in filing is manifested by certain simple objective, extrinsic phenomena, acts or circumstances related to the debtor, and that a mere outward appearance should mandate a conclusion in the fact-finding on the issue absent compelling proof to the contrary.

■ Guidance, however, can be taken from the developed jurisprudence on good faith under those provisions of the pre–2005 Bankruptcy Code that required a debtor to show it. *Etchu–Njang v. Gonzales,* 403 F.3d 577, 582 (8th Cir.2005) (where Congress reenacts specific terminology in statutory amendment, its failure to explicitly reject longstanding prior judicial construction of that language supports using that construction in applying new enactment); 1A Norman J. Singer, Sutherland Statutory Construction § 22:33 (6th ed.2003).

■ In the Eighth Circuit, that judicial construction has long recognized that a debtor's good faith in *proposing* a plan, as required by 11 U.S.C. § 1325(a)(3), is generally measured by "whether the plan constitutes an abuse of the provisions, purpose, or spirit of Chapter 13." *In re Estus,* 695 F.2d 311, 317 (8th Cir.1982). The broader inquiry is "whether the Bankruptcy Code is being unfairly manipulated by the debtor." *Educ. Asst. Corp. v. Zellner,* 827 F.2d 1222, 1227 (8th Cir.1987). Put another way, ". . . a plan is considered proposed in good faith if there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the Code." *Hanson v. First Bank of South Dakota, N.A.,* 828 F.2d 1310, 1315 (8th Cir.1987) (interior quotes omitted) (applying good faith requirement of 11 U.S.C. § 1129(a)(3)). In turn, the construction of "good faith" under § 1325(a)(3) may be applied to determine whether a debtor *filed his initial Chapter 13 petition* in good faith, and a lack of good faith in filing can be grounds for dismissal of the case under 11 U.S.C. § 1307(c) through a judicial gloss imposed on that statute. *In re Molitor,* 76 F.3d 218, 220–221 (8th Cir.1996).

■ Finally, and most on-point to this case, a debtor's patent failure to establish as a matter of fact that her plan is feasible may support a finding of lack of good faith, *National School Bus, Inc. v. Carignan,* 190 B.R. 739, 741 (N.D.N.Y.1996), particularly where that failure occurs in a second or third bankruptcy case commenced by the same debtor, in which the same objecting creditor's interests are implicated, *In re Goodwin,* 328 B.R. 868, 871–872 (Bankr.

M.D.Fla.2005). This end result dovetails with the Eighth Circuit's general observation, enunciated most pointedly in *Zellner*, that the good faith requirement functions to prevent unfair manipulation of bankruptcy remedies. 827 F.2d at 1227. In its earliest pronouncement on § 1325(a)(3), the Eighth Circuit held that the Bankruptcy Code's definition of "individual with regular income"

> contemplates that a debtor make payments and that the debtor's income sufficiently exceeds his expenses so that he can maintain a payment schedule.

*In re Terry*, 630 F.2d 634, 635 (8th Cir. 1980).[18] This definition keys back into the fundamental eligibility for relief under Chapter 13, under 11 U.S.C. § 109(e).[19] Going as it does to the basic right to propel a Chapter 13 case forward, an articulable theory for feasibility, grounded in admissible evidence, has to be one key requirement of good faith, both for an initial filing under Chapter 13 and for the proposal of a plan. *Id.* (noting that "the spirit of ... Chapter [13 is], that the debtor 'make payments' under a plan ...").

■ In enacting § 362(c)(3)(C), then, Congress clearly intended to make a debtor in a successor case under Chapter 13 prove early that she could perform through the end of the term of her plan, and to establish that by compelling evidence. That proof must come forward in the same procedural context, i.e., the debtor's motion under § 362(c)(3)(C), whether the presumption applies or not.

■ Where the presumption does not apply, a debtor as movant still has the initial burden of proof on the issue of good faith, as the proponent of the extension of the stay.

Where the presumption springs from the record in the predecessor case—as under § 362(c)(3)(C)(i)(II)(cc)—the debtor must come forward to rebut it. In either instance, the issue would be structured by prior case law as discussed earlier, and any applicable text of the post-Act Code, subject to the appropriate burden of proof.

Under § 362(c)(3)(C)(i)(II), the presumption is more properly asserted after the debtor's case in chief on evidentiary presentation.[20] The argument here would be that the debtor's evidence does not demonstrate a "substantial change in the financial or personal affairs of the debtor"—and, by implication, that the debtor will be no more able to live up to his obligations under his current plan than he was able to, or cared to, in the earlier case.[21]

---

18. The current location of this definition is at 11 U.S.C. § 101(30).

19. This statute provides that "[o]nly an individual with regular income" and debts below certain stated ceilings "may be a debtor under chapter 13 ..."

20. This is so because the statutory language does not trigger the presumption from an event or circumstance in the prior case, but rather from intervening developments (or, more accurately, intervening non-developments). Those circumstances will not be fully evident until the close of the debtor's initial presentation on his motion.

21. Section 362(c)(3)(C)(i)(II)(cc) addresses the situation where the earlier case was dismissed for the debtor's default under a confirmed plan; arguably, by operation of simple logic, it should preempt the field for that situation. Section 362(c)(3)(C)(i)(III) would then apply to the situation where the dismissal of the earlier case, voluntarily by the debtor or on motion, was for a reason other than default in payment under a confirmed plan. This could include the situation where an earlier case was dismissed on motion due to the filing of a "plan-buster" claim—a priority or secured claim far in excess of the presumed amount on which the structure of the confirmed plan was premised, rendering impossible the debtor's satisfaction of obli-

In either case, though, the ultimate issue of fact loops back around to feasibility under 11 U.S.C. § 1325(a)(6).[22] Colloquially, the question would be, "if the debtor didn't make the prior case work, what is there now that will make this one succeed?"

■ And here is where the presumption makes a debtor's task a difficult one. Where the presumption lies, it may properly be termed a "steep" one. *In re Collins*, 334 B.R. at 658 and n. 9. The quantum of evidence that must be brought forward to rebut it is heavier than the standard civil burden of a preponderance of the evidence.[23] Under this higher standard the evidence must "place in the ultimate factfinder an abiding conviction that the truth of [the proponent's] factual contentions are highly probable." *Colorado v. New Mexico*, 467 U.S. 310, 316, 104 S.Ct. 2433, 81 L.Ed.2d 247 (1984) (quotation omitted). The evidence must be " 'so clear, direct and weighty and convincing as to enable the factfinder to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.' " *Cruzan v. Director, Missouri Dept. of Health*, 497 U.S. 261, 285 n. 11, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990) (quoting *In re Jobes*, 108 N.J. 394, 529 A.2d 434, 441 (1987)). *See also, in general, Cornell v. Nix*, 119 F.3d 1329, 1334–1335 (8th Cir. 1997). Here, § 362(c)(3)(C) expressly subjects the Debtor to this heightened standard of proof.

■ In the last instance, the Debtor here did not meet her burden, whichever presumption is applied.

The historical backdrop was all-important. Anderson Homes had been repeatedly frustrated in its realization as a creditor, both by the Kurtzahns' chronic default in payment over multiple years and by the repeated interruption of its efforts to realize on its collateral security. Simply stated, the Kurtzahns had shown precious little ability to actually pay for the mobile home, for most of the eight-year period in which they had been contractually obligated to do so. To proceed in this case after the 2004 case failed, the Debtor had to show with "clear, direct, . . . weighty and convincing" evidence that her household now would have enough sustained income to support her proposal to restructure this debt, via timely monthly payments over a full five-year period.

The mere factors of the Kurtzahns' ages and shaky health status are enough to cast a general doubt on their ability to do this.[24] Ultimately, though, after the Debtor had her best shot at mastering evidence, it is clear that her household simply will not generate sufficient income overall to fund the payments she would have to make in order to fully consummate her plan. When Debtor Vernon Kurtzahn's average monthly wages from driving bus are reduced to account for the regular historical drop in hourly work over the summer months, the Debtor's total net household

---

gations pursuant to the terms of a confirmed plan. The case at bar does not turn on whether these two provisions are mutually exclusive. As a result, the analysis on their scope and overlap need go no further, and one can apply both provisions in succession.

**22.** This statute requires the debtor to show that "the debtor will be able to make all payments under the plan and to comply with the plan."

**23.** In the absence of the presumption, the debtor's burden under § 362(c)(3)(B) would be a preponderance of the evidence. *In re Charles*, 334 B.R. 207, 216–217 (Bankr. S.D.Tex.2005).

**24.** This can be said despite the assessment of the evidence that went to the narrower issue of Vernon Kurtzahn's current ability to work, made *supra* at pp. 361–362.

income drops to a figure 20% below that necessary to sustain performance under her modified plan. This adjustment simply must be made; the uncontroverted evidence gives the lie to Schedule I's bland assertion of monthly wage receipts of $1,318.63 that are even and equal year-round. The Debtor's scheduled household expense are quite bare-bones for a group of three adults. There is literally no room to cut any of them and, in any event, the Debtor did not offer to make any such adjustments to bring her household's disposable income up to the point of supporting a feasible plan. Indeed, the lack of any budgeting for emergency or "contingency" expenditures shows just how tenuous this household's grasp on security is—a circumstance already established by the events of two recent summers.

The limits of real, disposable income in this household have their real impact when compared to the debt structure. Functionally, the whole of the modified plan over its entire duration is directed toward the satisfaction and elimination of the secured claim of Anderson Homes; no more than a modicum of its funding would go to any other recipients.[25] The point here is that the Kurtzahns' debt structure simply has no room for the Debtor to credibly and defensibly adjust the proposed amortization to fit the actual amount of disposable income. The proposed servicing of a secured claim in favor of Anderson Homes presumably is based on an attributed valuation of the collateral, which upon application of 11 U.S.C. § 506 determines the amount of the creditor's secured claim in a so-called "undersecured" situation. *Associates Commercial Corp. v. Rash,* 520 U.S. 953, 961, 117 S.Ct. 1879, 138 L.Ed.2d 148

(1997); *United States v. Ron Pair Enter., Inc.,* 489 U.S. 235, 238–239, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). This valuation-driven process cannot be further jiggered to fit the fiscal contours of the case without destroying its own credibility. *In re Soost,* 290 B.R. 116, 123–125 (Bankr.D.Minn. 2003).

So, the Debtor has not only proposed a plan that is not feasible, she is not capable of proposing a feasible plan that would contend with the reason why she sought bankruptcy relief in the first place. Her proof did not even preponderate, let alone rise to "clear and convincing" quality.

For the record, then:

1. The Debtor failed to rebut the presumption of § 362(c)(3)(C)(i)(II)(cc), because she did not prove that her modified plan for this case was feasible as is required by 11 U.S.C. § 1325(a)(6).

2. The Debtor failed to rebut the presumption of § 362(c)(3)(C)(i)(III), because she failed to prove that her total household income had increased so as to enable her to conclude this case with full performance under a confirmed plan.

3. The Debtor, therefore, did not file this case in good faith as to any of her creditors who would be subject to an extension of the stay of 11 U.S.C. § 362(a) pursuant to 11 U.S.C. § 362(c)(3)(B).

### ORDER

As a result,

IT IS HEREBY ORDERED that the Debtor's motion for an extension of the

---

**25.** Specifically, $1,500.00 would be directed toward the payment of the Debtor's attorney fees, and $2,268.64 to the Standing Trustee's compensation. Some sort of private claim owing to Benton County—probably personal property taxes on the mobile home—would be paid in the amount of $100.00. At the very end of 60 months, unsecured creditors would share a mere pittance, a residuum of $412.55, pro rata.

protection of the stay under 11 U.S.C. § 362(a) is denied.